UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| WINFORGE, INC. and BYRON McMAHON, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | 1:06-cv-619-SEB-JMS |
| COACHMEN INDUSTRIES, INC., ALL AMERICAN HOMES, LLC, and MOD-U-KRAF HOMES, LLC, | ) ) ) ) | |
| Defendants. | ) ) | |

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This cause comes before the Court on the cross-motions for summary judgment [Docket Nos. 81 and 83] filed by Plaintiffs, Winforge, Inc. ("Winforge") and Byron McMahon, and Defendants, Coachmen Industries, Inc. ("Coachmen"), All American Homes, LLC ("All American"), and Mod-U-Kraf Homes, LLC ("Mod-U-Kraf"), pursuant to Federal Rule of Civil Procedure 56.  This lawsuit arose following a botched business venture involving the development and construction of a hotel in Pigeon Forge, Tennessee.

Through previous entries made in the course of this litigation, we have narrowed the scope of this dispute to a significant degree.  Nothing about this case has been

straightforward, simple or entirely clear from one step to the next.  In the motions

currently under consideration, the parties seek summary judgment as to: Winforge's

breach of contract claim (Count Seven of the Complaint); Plaintiffs' claim that Coachmen

failed to properly commence foreclosure proceedings in accordance with Indiana law

(Count Nine); and two claims related to Plaintiffs' obligations, if any, under loan

documents entered into with Coachmen (Count Eight, seeking declaratory judgment

defining Plaintiffs' rights and obligations with respect to the loan documents, and

Coachmen's counterclaim, seeking to collect amounts allegedly due thereunder).  For the

reasons detailed in this entry, we <u>DENY</u> Plaintiffs' motion in its entirety, <u>DENY</u>

Defendants' motion as to Count Seven, and <u>GRANT</u> Defendants' motion as to Counts

Eight and Nine and Coachmen's Counterclaim.


## **Factual Background**

Coachmen is a corporation engaged in the modular housing business.  All

American is a subsidiary of Coachmen, and Mod-U-Kraf is a subsidiary of All American.

Pls.' Ex. A (Interrogatory Resp. #18).  All American and Mod-U-Kraf design,

manufacture, and market modular housing and commercial structures.  Pls.' Ex. G

(3/12/04 SEC Form 10-K) at 6.  All American and Mod-U-Kraf are wholly owned by

Coachmen.  Pls.' Ex. A.

Plaintiffs note that, during the relevant timeframe, there was substantial overlap

among the officers of the three entities that are Defendants in this case.  In particular,

Claire C. Skinner serves as both Chairman and (for some time) President of Coachmen, and also as President of Mod-U-Kraf; Richard M. Lavers served as Secretary of all three entities; Steven Kerr served as President of All American and of Mod-U-Kraf; and Kathy Samovitz served as Assistant Secretary of both Coachmen and Mod-U-Kraf.  Mod-U-Kraf and Coachmen also shared the same principal office address in Elkhart, Indiana. Pls.' Mem. at 4-5.

### Initial Agreements Among the Parties

In early 2003, Plaintiff Byron McMahon sought to develop a Wingate Inn Hotel (the "Project") in Pigeon Forge, Tennessee.  He acquired real estate on which he intended to build, and formed the Winforge corporation as the entity to develop, own, and operate the hotel.  McMahon Aff. ¶ 4.  Beginning in or about April 2003, Mr. McMahon and Winforge began negotiations with Coachmen with regard to building the Project via modular construction.[1]

Following several months of negotiations, the parties entered into a series of agreements setting forth terms for the financing and construction of the Project.  All of the relevant agreements were executed on or about April 14, 2004.  Among these agreements was a Loan Agreement, in which Coachmen loaned the necessary capital to Winforge.  The Loan Agreement was accompanied by a Promissory Note executed by

---

[1] The parties dispute whether Coachmen or Winforge initially approached the other party with regard to the Project; however, the disagreement is immaterial for purposes of ruling upon the present motion.

Winforge to Coachmen, as well as Security Agreement, Deed of Trust, and other

documents; in addition, Mr. McMahon executed and delivered to Coachmen a personal

Guarantee to further secure Winforge's debt.  Pursuant to the terms of the Loan

Agreement (and a series of amendments thereto), Coachmen advanced to Winforge

amounts totaling nearly $2.4 million between April 2004 and December 2005, none of

which has to date been repaid.  Defs.' Ex. B (Resp. to Request for Admission #1).

 As required by the terms of the Loan Agreement, Winforge also entered into an

agreement with Mod-U-Kraf (the "Development Agreement") whereby Mod-U-Kraf

agreed, among other steps necessary to the development of the hotel, to perform

construction, provide labor and materials, and obtain necessary governmental approvals.

Certain provisions of the Development Agreement have particular significance here.

First, among the tasks Mod-U-Kraf agreed to perform were the following duties:

> Mod-U-Kraf shall manufacture modular units at the Mod-U-Kraf
> manufacturing facilities in accordance with the approved Specifications and
> Drawings.   Drawings to meet local, state, 3rd party and franchiser
> requirements.   To include only materials and on-site services specified as
> supplied by [Mod-U-Kraf].
>
> [Mod-U-Kraf] will provide architectural drawings and foundation footprint,
> and receive all state, local and county approvals.  [. . .]

Dev. Agreement Exhibit A (Special Project Division Preliminary Scope of Work), ¶¶ 1.2,

4.1.

 In addition, the Development Agreement contained the following consequential

damages waiver provision:

4

> Winforge, its Project Manager, and [Mod-U-Kraf] agree to waive all claims against each other for any consequential damages that may arise out of or relate to this Agreement and the other Construction Contract Documents. Winforge and its Project Manager agree to waive damages (including, but not limited to, loss of use of the Project, any rental expenses incurred, loss of income, profit or financing related to the Project, as well as the loss of business, principal office overhead and expenses, loss of profits not related to this Project, or loss of reputation).  [. . .]

Dev. Agreement ¶ 17.

### *Complications Arise in Execution of the Project*

The Wingate Inn project was plagued by troubles from the outset.  Below, we summarize the primary developments from the time the project documents were signed to the eventual foreclosure on the property.

#### <u>Manufacturing Moves from Virginia to Tennessee</u>

In June 2004, Steven Kerr, President of All American and Mod-U-Kraf, proposed that construction of the modular units be moved from Mod-U-Kraf's Virginia facility to All American's Tennessee facility, and that Mod-U-Kraf subcontract the construction of the modular units to All American.  On June 7, 2004, Mr. McMahon sent to Mr. Kerr a letter asking why Winforge had not yet received appropriate architectural drawings, and expressing concern that construction was progressing more slowly that he had anticipated.  Mr. McMahon sought assurance that a change in manufacturing location would not further delay the Project.  Mr. Kerr subsequently proposed a meeting at All American's

Tennessee factory; Winforge sent representatives (Mike Lee and John Hauser) to the meeting who approved the factory location change.

*Revisions to the Scope of Work*

Also in June 2004, according to Defendants, Winforge determined that it could secure certain components of the modular units (such as a sprinkler system, heating and air conditioning units for guest rooms, and other items) – which, under the "Preliminary Scope of Work" attachment to the Development Agreement, were the responsibility of Mod-U-Kraf – more cheaply by hiring its own subcontractors to supply and install these components. Accordingly, on June 23, 2004, according to Defendants, the parties agreed that a revised Scope of Work needed to be prepared. Jeffrey Powell[2] Aff. ¶ 11. Mod-U-Kraf sent to Winforge's representative revisions to the Scope of Work document on or about July 27, 2004, and September 24, 2004. Id. ¶ 13.

Mod-U-Kraf asserts that it needed Winforge to provide it with specifications for the components for which Winforge was now responsible, so it could incorporate them into its plans for the modular units, and that it could not submit these plans to the State of Tennessee for approval until Winforge did so. Id. ¶ 12. Despite repeated communications sent to Winforge representatives, Lee and Hauser (Defs.' Exs. 2, 3),

_____

[2] Jeffrey Powell was during all relevant times the Vice President and General Manager of Mod-U-Kraf. Powell Aff. ¶ 2.

6

Defendants assert that they had not received all the necessary information from Winforge by July 27, 2004.  Defs.' Ex. 4.

*Difficulties Obtaining Local and State Approvals*

According to Defendants, progress on the Project was further impeded by the fact that, in June 2004, the State of Tennessee Fire Marshal's Office proposed (and soon after adopted) new rules for modular building construction.  Powell Aff. ¶ 14; Defs.' Ex. 7.  However, the State permitted local jurisdictions to "opt out" of the new rules and continue to base *local* approvals on the old rules; the City of Pigeon Forge chose the "opt out" option.  Powell Aff. ¶ 15.  Accordingly, the plans for the Project effectively had to comply with two different sets of rules before it could be approved by state and local authorities.

However, as Defendants describe it, this rule change created a "catch-22" situation for obtaining the necessary approvals.  The State of Tennessee announced that it would not approve the plans until local approval had been obtained; however, the City of Pigeon Forge announced that it would not review the drawings until state approval had been obtained.  Id. ¶¶ 16, 17.  All American sought assistance from state authorities in resolving the deadlock.  Defs.' Ex. 9 (October 20, 2004 email describing conversation with state official).

On October 29, 2004, Mike Lee (a principal of Flagship, which was serving as Project Manager of Winforge) sent to All American an email recognizing the bureaucratic

7

hurdles, and stating that: "We know you're working on that catch 22 but when the state is satisfied you'll need to submit and satisfy the city as well."  Defs.' Ex. 10.  Winforge maintains that, at about this time, it was Winforge's understanding that All American had submitted architectural plans to the State of Tennessee for approval, based on a copy of a letter it had received from the State regarding certain documentation that needed to accompany the plans.[3]  McMahon Aff. ¶ 9; Pls.' Ex. 3.  On October 22, 2004, All American sent Winforge a letter informing Winforge that it was "preparing to manufacture" the modular units, and that it was awaiting approval by the State of Tennessee.  Pls.' Ex. 4.  Winforge alleges that, at this point, it had "little, if any, further meaningful contact with Mod-U-Kraf with regard to the Project."  McMahon Aff. ¶ 10.

On October 27, 2004, Winforge asserts that it reviewed All American's drawings that had been submitted to the State of Tennessee, and determined that the drawings had been copied from prototype drawings it had received from Wingate Inn, which were marked "not for construction."  In Winforge's estimation, the drawings were not likely to meet state and local building codes.  Id. ¶ 11.

On November 1, 2004, All-American sent to Winforge's representative an email stating that All American had a meeting scheduled with the State of Tennessee in order to resolve "any outstanding issues with the submittals" and that All American had also "talked to [the city of] Pigeon Forge on getting them what they need.  We have to resolve

---

[3] The letter, sent to architect Robert Gregg, required that Mr. Gregg provide a "letter of assurance" guaranteeing that the drawings were prepared under his supervision and that he was competent in several areas of design.  Pls.' Ex. 3.

how to submit under different codes and hope to find out what is required at this meeting." Defs.' Ex. 11. All American also informed Winforge that neither the State of Tennessee nor the City of Pigeon Forge would accept the proposed sprinkler system, which was Winforge's responsibility to provide. Id.

By November 15, 2004, Winforge was under the impression that the plans were deficient and would need to be corrected before approval would issue from the state. McMahon Aff. ¶ 12; Pls.' Ex. 5 (November 15, 2004 Pigeon Forge Public Works Dept. Memo, stating that: "The plans submitted to the State had many obvious violations of the 2003 [International Building Code] and [the State of Tennessee] would not accept them. The State has required corrected plans to be submitted.").

*Continued Problems With the Scope of Work Document*

Throughout January 2005, the parties continued to have disagreements regarding the Scope of Work document incorporated into the Development Agreement. On January 18, 2005, All American sent Mr. Lee (representing Winforge) an email listing several issues that needed to be resolved prior to resubmission of plans to T.R. Arnold and Associates (a third-party design review company that All American had hired to review and submit the plans to the State of Tennessee). Each of the issues involved aspects of the project for which All American understood Winforge would be responsible, pursuant to the Revised Scope of Work prepared in the summer of 2004. Powell Aff. ¶ 24; Defs.' Ex. 12.

Mr. Lee responded by email, informing All American that Mr. McMahon had not reviewed nor accepted the Revised Scope of Work sent by All American in September 2004, and that he expected the Preliminary Scope of Work attached to the Development Agreement to be honored.  Defs.' Ex. 13.  All American responded that it had "a hard time understanding why after 4 months [the Revised Scope of Work was being] rejected[.]" Defs.' Ex. 14.

A few days later, on January 25, 2005, a conference call was held among Mr. Lee and representatives of Mod-U-Kraf, All American, and Coachmen.  Defendants assert that, during this conference call, Mr. Lee acknowledged that the preliminary Scope of Work document had been modified and that Mod-U-Kraf had prepared a revised document, but stated that Mr. McMahon now felt that Mod-U-Kraf should honor the obligations to which it had committed in the preliminary Scope of Work.  Powell Aff. ¶ 27, Kurth Aff. ¶ 10.  Mod-U-Kraf responded that this was impossible because changes had already been made based on the revised Scope of Work.  Ultimately, it was determined that Mr. Lee would gather the information from Winforge's subcontractors which All American had requested prior to resubmission of the plans, and would provide that information to All American.  Id.

On February 16, 2005, Winforge submitted to Coachmen a memo describing current work being done on the Wingate project, which made repeated reference to various tasks being delayed based on All American's failure to complete its duties (such as provision of approved drawings) "per original agreement."  McMahon Aff. Ex. 6.

10

Defendants interpret this phrase as a reference to All American's responsibilities under the *original* (not revised) Scope of Work.

Further delays with the building plans occurred over the next few months; All American asserts that it spent this time waiting for Mr. Lee and Winforge's subcontractors to supply needed information before it could be submitted for state review. On February 22, 2005, Winforge sent All American an email asserting that Winforge's hired mechanical engineer would have drawings sent in by the end of the week.  Kurth Aff. Ex. 3.  After further delays, Mod-U-Kraf received the drawings from Mr. Lee on March 4, 2005; following submission of further information and clarifications from Winforge, All American transmitted these plans to T.R. Arnold & Associates (the third-party review company) on about May 4, 2005, and they were then submitted to the State of Tennessee.  Id. Ex. 8.  At about this time, Winforge was notified by All American that the documents had been submitted for review.  At this time, Coachmen president Matt Schafer requested that Winforge include All American representative Dave Johnson and Coachmen representative Dave Kurth on all future emails related to the project. McMahon Aff. Ex. 7.

*Deviations in the Project Drawings*

After submission of the plans, Winforge asserts that it began to notice a number of defects in the submitted documents – for example, there was no architect of record listed, and no seal on any of the copies.  Indeed, on May 13, 2005, the State of Tennessee sent to

T.R. Arnold a list of 48 "deviations" in the documentation which needed to be addressed and the documents resubmitted.[4]  McMahon Aff. Ex. 8.  Defendants assert that most of these items were of the "crossing the t's and dotting the i's" variety, and that four of the deviations involved Winforge's subcontractors and needed to be addressed by Winforge.

A few days later, Mr. Kurth of Coachmen had a conversation with Mr. Bartlett of the State of Tennessee, during which Mr. Bartlett informed him that the City of Pigeon Forge was going to proceed with its own review of the project while the deviations were being resolved with the State of Tennessee.  Mr. Bartlett told Mr. Kurth that Winforge should proceed with its permit application to the City of Pigeon Forge.  Kurth Aff. ¶ 23.  Mr. Kurth told Mr. McMahon and Mr. Lee of Winforge about this development, and sent them copies of the application that had been submitted to the State, so Winforge could submit them to the City.  Kurth Aff. Ex. 10.

The parties held a meeting at Mod-U-Kraf's office on July 6, 2005, during which Mr. Kurth (of Coachmen) advised Winforge's representatives that the State of Tennessee was able to review the plans and issue a "Letter of Filing" without necessarily waiting for the City of Pigeon Forge to issue its own building permit.  He also informed them that two of Winforge's contractors had not provided All American with the necessary amendments to resubmit the plans to the State, and gave them two original sets of drawings for Winforge to submit to the City.  According to Mr. Kurth, Mr. Lee then

---

[4] In June 2005, the State of Tennessee also raised as an issue whether the hotel's lobby would meet building codes; All American asserts that this was Winforge's responsibility because the lobby design had been submitted by Winforge, and informed Winforge that All American would not be able to complete its revisions until these problems were ameliorated.

informed Mr. Kurth that Winforge did not have an Architect of Record for the project.

Kurth Aff. ¶ 27.  Defendants assert that Winforge still did not have an Architect of

Record for the project by August 1, 2005.  Defs.' Resp. at 14.

Winforge frames the issue differently, stating that in late July of 2005, it was

Winforge's understanding that "there were additional issues in the drawings" (Pls.' Mem.

at 12) and that All American "[did] not know what the hell they [were] doing."  Pls.' Ex.

13 (Lee memo).  Winforge was frustrated that, because the necessary approvals had still

not been secured, they had not yet been able to obtain a building permit, secure a general

contractor, or secure accurate bids for on-site work.  Winforge emphasizes that Mr.

Kurth, of Coachmen, was personally involved in efforts to secure the necessary drawings

at this point.  Pls.' Mem. at 13.

### *State and Local Project Approvals and Further Delays*

At some point over the next few months (though it is unclear from the record

precisely when), All American received amended drawings from Winforge's

subcontractors and was able to resubmit the plans to the State of Tennessee.  On August

30, 2005, the State of Tennessee issued a Notification of Receipt and Letter of Filing

approving the project.  Kurth Aff. Ex. 13.  The next day Mr. Kurth sent to Mr. Lee two

copies of the approval letter and state-approved plans for submission to the City of Pigeon

Forge – a step for which, Defendants emphasize, Winforge was responsible.  Kurth Aff.

Ex. 14.

By October 6, 2005, T.R. Arnold informed the parties that the City of Pigeon Forge had accepted the project plans and determined that no further review would be necessary.  The next step was to "pull a building permit" and hire an architect to provide site inspections and file reports with the City.[5]  Kurth Aff. Ex. 15.

The parties met at Coachmen's corporate office on November 21, 2005, in order to review the status of the general contractor selection and building permit (both of which, Defendants assert, were Winforge's responsibility).[6]  Mr. McMahon informed All American and Coachmen at the meeting that Winforge still had neither a general contractor nor a building permit.  Kurth Aff. ¶ 37.  A subsequent series of emails between All American and Winforge demonstrates that All American was still working on drawings and plans, even though the modular unit plans had already been approved;[7] Defendants assert that this was because Winforge still had not hired a general contractor or retained an Architect of Record, so Winforge "kept asking [All American] to perform design work for portions of the Project that were not included in the scope of work [Mod-U-Kraf] had agreed to provide as necessary to the [modular] construction, but which were nonetheless necessary to the completion" of the project.  Kurth Aff. ¶ 40.  Mr. Kurth

_____

[5] At around this time, the decision was made to move the manufacturing of the modular units for the second time, from All American's Tennessee plant to its North Carolina plant.  Defendants assert that this change did not further delay the project.

[6] Winforge asserts that, at the meeting, Coachmen president Matt Schafer became "centrally involved" with the project.

[7] Winforge points to several emails in which Coachmen representatives assert that Coachmen was "all over the drawings[,]" that Coachmen's "team is on it," and that "these plans have to be as correct as possible . . . we already look bad enough."  McMahon Aff. Exs. 17-19.

testified that "[t]hese items were not [All American's] responsibility, but [All American] nevertheless tried to accommodate Winforge, in an attempt to move the project forward." Id.  Winforge, on the other hand, asserts that given scope of work issues and continued problems surrounding All American's drawings, "Winforge still could not even secure a general contractor in order to move forward with the Project."  McMahon Aff. ¶ 28. Winforge asserts that Coachmen committed at a December 2005 meeting that the project would go into production by February 20, 2006, and continued to make assurances that the project would be accomplished over the next month.  Id. ¶ 29.

In around December 2005, however, Coachmen forwarded a General Release Agreement to Mr. McMahon and Winforge, purporting to "irrevocably and unconditionally release, acquit and forever discharge" Coachmen, All American, and Mod-U-Kraf from further obligations. Id. ¶ 30.  Plaintiffs did not execute the agreement.

### Coachmen's Hire of General Contractor and Pigeon Forge's Denial of Building Permit

On about January 19, 2006, Mr. Schafer of Coachmen sent Mr. McMahon an email asserting that *it* was engaging a General Contractor and an Architect of Record itself, since Winforge had not done so, and reasserting that "[w]e are committed to our on line date of Feb[ruary] 20th."  McMahon Aff. Ex. 26.  However, shortly thereafter, the City of Pigeon Forge indicated that it would *not* issue a building permit for the project, due at least in part to potential problems in connecting the hotel to the water and sewer

systems.  Compl. Ex. 12.  Defendants assert that this effectively "killed the Project."

Defs.' Resp. at 18.[8]

On February 23, 2006, Coachmen informed Winforge that it was in default of the

loan for its failure to timely repay the loan and based on the refusal of the City of Pigeon

Forge to issue a building permit for the project.  Coachmen asserted that, under their

agreements, it was entitled to take over and complete construction of the hotel at

Winforge's risk and expense, and to declare the Promissory Note to be immediately due

and payable.  Compl. Ex. 13.

Mr. McMahon testifies that it was Winforge's understanding at the time that the

loan provided by Coachmen (which amounted to $2.3 million in total advanced funds)

"was tantamount to Coachmen simply paying itself" for its own services and those of its

subsidiaries All American and Mod-U-Kraf.  Accordingly, Winforge viewed the loan as

"Coachmen's money . . . simply going from its right pocket to its left pocket" and did not

understand why it would be responsible for repaying Coachmen.[9]  Pls.' Mem. at 19.

---

[8] Shortly thereafter, Mr. McMahon sent an email to Kathy Samovitz (of Coachmen and Mod-U-Kraf), stating that "I would like to state for the record that I am still waiting for a signed and stamped copy of a completed set of plans.  I have been promised this since 4/22/04 and have yet to receive them.  I need this set of plans to hire a [General Contractor] . . . As per the contract, I have completed all of my responsibilities but have been unable to do anything further without a completed and stamped set of drawings."  McMahon Aff. Ex. 28.  Winforge notes that, shortly thereafter, on February 6, 2006, Mr. Schafer was terminated from Coachmen for "personal violations of company policies."  SEC Form 8-K (filed February 7, 2006).  There is no indication in the evidentiary record that such termination was related in any way to the Wingate Inn project or Coachmen's dealings with Winforge or Mr. McMahon.

[9] Winforge asserts that it attempted to set up a meeting to resolve these issues with Coachmen, but that Coachmen was unwilling to meet.  In March 2006, Coachmen informed Winforge that any further communications between the parties needed to be in the presence of counsel.

Coachmen counters that Winforge's supposed "understanding" is completely false, and that neither Coachmen nor All American nor Mod-U-Kraf in fact received *any* of the $2.3 million advanced under the Loan Agreement and Note.  Rather, Coachmen asserts, much of the amount was used to pay off the prior mortgage on the real estate, various Winforge subcontractors, and much of it to Winforge and Mr. McMahon himself.  Defs.' Resp. at 19-20.

### *Foreclosure Proceedings and Sale of the Real Estate*

On March 24, 2006, Coachmen advised Winforge that it would initiate foreclosure proceedings on the property pursuant to the Deed of Trust, and attached a Note of Foreclosure stating that the property was to be sold on April 21, 2006.  Plaintiffs contacted Coachmen and requested a postponement of the foreclosure sale pending court direction, which (Plaintiffs assert) Coachmen refused.  On April 17, 2006, Plaintiffs filed this lawsuit and sought to enjoin the foreclosure sale.

We granted a preliminary injunction to stay the sale, conditioned on Plaintiffs' posting a bond in the amount of $1.4 million.[10]  Plaintiffs were unable to do so within the allotted time period and so, on September 22, 2006, we reduced the amount of the required surety by ordering Plaintiffs to post bond in the amount of $500,000.00 by no later than October 2, 2006, warning that a failure to do so would result in the dissolution

---

[10] After a hearing on July 19, 2006, we permitted Plaintiffs to substitute a letter of credit for a bond.

of the injunction.  Again, Plaintiffs did not post the required bond, and we dissolved the injunction on October 5, 2006.  On November 15, 2006, the real estate was sold; Coachmen held the highest bid and purchased the property for $1.8 million.  On January 30, 2007, Coachmen auctioned the personal property that it held as collateral pursuant to the Security Agreement; the net proceeds of $283,142.79 were paid to Coachmen.

Coachmen calculates that, as of the date on which it filed its summary judgment motion (October 1, 2007) and, after deducting the proceeds from the foreclosure sale and the auction of personal property, Winforge owes Coachmen $721,339.95, plus additional currently-accruing interest.  It notes that Mr. McMahon is personally liable for this amount pursuant to the terms of his Guarantee.

### Procedural Posture

Plaintiffs' Complaint enumerated ten counts against the various Defendants in this action; Coachmen also asserted a counterclaim against Plaintiffs.  We previously dismissed several of these counts in our March 13, 2007, Order Granting in Part and Denying in Part Defendants' Motion to Dismiss.  Therefore, the only remaining claims are the following: Count Seven, a breach of contract claim against all Defendants on behalf of Winforge;[11] Count Eight, which seeks a declaratory judgment that Plaintiffs have no further obligations under the loan documents; Count Nine, in which Plaintiffs

---

[11] We previously dismissed Count Seven in part, to the extent it purported to state a claim on behalf of Mr. McMahon personally.  See March 13, 2007 Order at 12-14.

claim that Coachmen failed to commence foreclosure proceedings in accordance with controlling Indiana law; and Coachmen's Counterclaim, in which it seeks to collect the remaining funds it asserts are due under the loan documents.

In the instant cross-motions for summary judgment, both filed on October 1, 2007, Plaintiffs seek summary judgment as to Counts Seven and Eight and Coachmen's Counterclaim. Defendants seek summary judgment as to Counts Seven, Eight, and Nine and Coachmen's Counterclaim. We consider each claim in turn.

## **Legal Analysis**

### I.    **Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

19

(1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

Courts often confront cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief.  "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard." Kohl v. Ass'n of Trial Lawyers of Am., 183 F.R.D. 475 (D.Md.1998). Thus, in determining whether genuine and material factual disputes exist in this case, the Court has considered the parties' respective memoranda and the exhibits attached thereto, and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective non-movant.  Matsushita, 475 U.S. 574.  Disputes over contractual construction are frequently amenable to disposition upon a motion for summary judgment.  See Kallman v. Radioshack Corp., 315 F.3d 731, 735 (7th Cir. 2002).

## II.    Count Seven: Winforge's Breach of Contract Claim

### A.    Whether a Breach Occurred

Both Winforge and Defendants assert that they are entitled to summary judgment as to Count Seven of Plaintiffs' Complaint.  In Count Seven, Winforge asserts that Mod-U-Kraf breached its explicit contractual obligations under the Development Agreement by failing to "(a) provide Winforge with the Plans and Specifications; (b) receive all state and local approvals for the Project . . . ; and (c) manufacture the modular components in a timely manner and in accordance with the approved Plans and Specifications."  Compl. at

11.  Winforge also claims that Coachmen and All American knowingly and intentionally contributed to Mod-U-Kraf's breach of the Development Agreement.

Winforge also maintains that, according to the explicit terms of the Development Agreement, changes to the scope of work to be performed could only have been accomplished through the execution of a formal "Change Order" specifying the changes in the scope of work and any changes in contract price and time, to be signed by the General Contractor and Mod-U-Kraf.  A sample Change Order was attached to the Development Agreement as an exhibit.  Development Agreement ¶¶ 2.1, 14.1.  Accordingly, Winforge maintains that the Preliminary Scope of Work was in force throughout the project.

Mod-U-Kraf counters that it *did* prepare the necessary drawings and plans for the *modular units* (as opposed to the entire project) and obtained required approvals for those units.  It admits that the modular units were not manufactured, but argues that the manufacturing delays were not Defendants' fault, and notes a clause in the Development Agreement entitling Mod-U-Kraf to an equitable extension of the contract time if work is delayed by causes beyond Mod-U-Kraf's control.  Development Agreement ¶ 12.1.  Mod-U-Kraf argues that numerous factors led to delays beyond its control, including Winforge's decision to supply various components of the modular units itself, and subsequent failure of Winforge and its subcontractors to provide Mod-U-Kraf with necessary information about those components for integration into the modular unit plans

– as well as Winforge's failure to retain an Architect of Record or hire a General Contractor.

Though Mod-U-Kraf describes negotiations between the parties regarding potential revision to the Scope of Work, it does not appear to challenge Winforge's assertion that there was no formal Change Order signed by the parties – nor that the Development Agreement specified this procedure for modification of the scope of Mod-U-Kraf's obligations under the agreement.  Regardless, it is clear that at least some of the tasks for which Mod-U-Kraf was responsible (most obviously, the manufacture of the modular units) were not accomplished.  The parties both ask us to declare, as a matter of law, that the blame for this and other failures lies properly with their opponents – and in support, each provides a litany of accusations regarding the other's foot-dragging and incompetence.

At the root of much of the finger-pointing is a chicken-and-egg problem.  Were Defendants executing additional drawings and specifications "above and beyond" their obligations because – as they claim – Winforge had failed to fulfill its own responsibilities (such as securing a general contractor) and Defendants wanted to see the project move forward?  Or, was Winforge – as it claims – unable to secure a general contractor and otherwise move forward with the project because Defendants' additional plans and drawings were deficient or untimely?  Each side premises its own failure on that of the other.

A key issue is whether Mod-U-Kraf was contractually obligated to complete

drawings and obtain approvals for only the modular units or for the entire project.  The
Development Agreement itself is fairly opaque on this point; it requires Mod-U-Kraf to
"provide all labor, materials, equipment and services necessary to complete the Work" –
"Work" is defined as "the construction and services necessary to fulfill [Mod-U-Kraf's]
obligations for the Project[.]"  Development Agreement ¶¶ 3.1.1, 2.15.  Though Plaintiffs
lean heavily on these somewhat circular general clauses in the Agreement (as well as the
equally general definition of "Project" contained therein), they are not particularly
illuminating as to the specific tasks which were to comprise Mod-U-Kraf's "Work."

The Scope of Work document attached to the Agreement is somewhat more
informative; it requires Mod-U-Kraf to "provide architectural drawings and foundation
footprint, and receive all state, local and county approvals."  Scope of Work ¶ 4.1.
Another clause requires Mod-U-Kraf to "provide modular units and material noted on
plans for installation and completion of a Wingate Inn.  This will include *all architectural
drawings*[.]"  Id. ¶ 1.2.  Upon our reading, these unqualified clauses appear to create the
obligations in question; it is difficult to square these seemingly plain statements with
Mod-U-Kraf's insistence that it was only required to complete such tasks as to the
modular units.  We question the genuineness of Mod-U-Kraf's protestations particularly
because its representatives repeatedly badgered Winforge for information so that it could
obtain necessary approvals and permits for the *entire structure*.  However, in the context
of a complex and lengthy real estate development project, the benefit of evidence

24

presented through the trial process is required to untangle this knot.[12]  Accordingly, both parties' motions for summary judgment are <u>DENIED</u> as to Count Seven.

### B.    Damages Waiver Provision

Defendants further assert that Winforge has waived all damages pursuant to the express terms of the "Mutual Waiver of Consequential Damages" provision in the Development Agreement, in which Winforge and Mod-U-Kraf "agree to waive all claims against each other for any consequential damages that may arise out of or relate to this Agreement and the other Construction Contract Documents[,]" specifically including loss of use of the Project and loss of income or profit.  Development Agreement ¶ 17.

Winforge rejoins that the provision waives only *consequential* damages, not direct damages, and that the damages sought in the complaint are direct and thus compensable. The parties do not dispute that Virginia law governs the agreement;[13] under Virginia precedent, the issue of whether damages are direct or consequential is a question of law. Direct damages flow "naturally" from a breach of contract, that is, they are "those that, in the ordinary course of human experience, can be expected to result from the breach."

---

[12]  Of course, if trial evidence demonstrates that these uncompleted tasks *were* Mod-U-Kraf's responsibility, the factfinder will further need to determine whether delays were due to factors beyond its control – i.e., the shortcomings of Winforge in fulfilling its own obligations.

[13]  The Development Agreement, by its terms, states that it to be governed by the laws of Virginia.  Development Agreement ¶ 26.3.  Defendants construe the contract under Virginia law (Defs.' Mem. at 6), and Plaintiffs concede for purposes of this motion that Virginia law governs. Pls.' Resp. at 4.

R.K Chevrolet, Inc. v. Hayden, 480 S.E.2d 477, 481 (Va. 1997).  Consequential damages, on the other hand, "arise from the intervention of 'special circumstances' not ordinarily predictable[.]"  Id.  In other words, consequential damages do "not flow directly and immediately from the act of the [breaching] party, but only from some of the consequences or results of such act."  Pulte Home Corp. v. Parex, Inc., 579 S.E.2d 518, 527 (Va. 2003) (citing Black's Law Dictionary, 2nd ed.).  Winforge asserts that all of its claimed damages[14] are direct damages which were not waived by the consequential damages provision.  Defendants rejoin that Mod-U-Kraf's promised performance was merely the manufacture and setting in place of the modular units for the project – i.e., not the entire "completion" of the Wingate Inn project – and that Winforge's damages claims are thus misplaced and based upon potential *secondary* consequences of Mod-U-Kraf's actions.

We hold that the loss of Winforge's initial investment in the real estate would be a natural and foreseeable consequence of a breach by Mod-U-Kraf, as would reasonable

---

[14] Winforge asserts in its response that it is seeking the following damages:

(1)     Loss of initial investment – Winforge's real estate having significant value – or in the alternative loss of the value of the real estate and improvements comprising the completed Project owned by Winforge;

(2)     An out-of-pocket hotel fee paid to Wingate Inns, International, Inc. in order to develop the Project, as well as out-of-pocket professional expenses incurred with regard to the Project; and

(3)     Increased cost to continue developing the Project.

Pls.' Resp. at 5-6.

fees and expenses incurred by Winforge during development.[15]  See Chesapeake and Potomac Telephone Co. of Virginia v. Sisson and Ryan, Inc., 362 S.E.2d 723, 731 (Va. 1987).[16]  In addition, increased interest costs due to an extended loan term during construction delays are considered direct damages.  Roanoke Hosp. Ass'n v. Doyle & Russell, Inc., 214 S.E.2d 155, 160-61 (Va. 1975).  Though Mod-U-Kraf's duties under the contract were "merely" the manufacture and completion of the modular units that were to comprise the Wingate Inn, it is clear that that responsibility was central to the completion of the building in its entirety, and that the breach of an agreement to perform this task would foreseeably have the effect of irretrievably delaying the completion of the entire development project.  Therefore, we hold that these damages sought by Winforge are direct, not consequential, damages of a breach of the Development Agreement, and are thus not barred by the consequential damages waiver therein.

## C.    Direct Participant Liability

Should Mod-U-Kraf be found to have breached its responsibilities under the Development Agreement, Winforge argues that Coachmen should be held directly liable as well, under the doctrine of direct participant liability.  A shareholder-corporation is generally not liable for the conduct of its subsidiary; however, if a parent company

---

[15]  We note that such fees and expenses have not been specifically enumerated by Winforge at this point in the litigation.  Certainly, unreasonable or unforeseeable expenses would not qualify as direct damages for which Defendants might be liable upon a finding of breach.

[16]  We note, however, that Winforge's alternative request for the loss of prospective value of the completed project is likely speculative and not compensable.  Banks v. Mario Industries of Virginia, 650 S.E.2d 687, 696-97 (Va. 2007).

"directly intervenes in the management of its subsidiaries so as to treat them as mere departments of its own enterprise, it is responsible for the obligations of those subsidiaries incurred or arising during its management."  Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 524 (1941); Esmark, Inc. v. Nat'l Labor Relations Bd., 887 F.2d 739, 755-56 (7th Cir. 1989) (describing direct participant liability as a "well-established exception to the general rule that the corporate veil will not be pierced in the absence of large-scale disregard of the separate existence of a subsidiary corporation" and distinguishing the direct participant doctrine from mere "aid[ing] and abett[ing]" of a subsidiary's tortious conduct or breach of contract); see generally Papa v. Katy Industries, Inc., 166 F.3d 937, 941 (7th Cir. 1999) ("[L]imited liability does not protect a parent corporation when the parent is sought to be held liable for its own act, rather than merely as the owner of the subsidiary that acted[.]").

Winforge asserts that Coachmen directly participated in Mod-U-Kraf's obligations under the Development Agreement due to the fact that it repeatedly referred to Mod-U-Kraf's business and facility as its own; that Coachmen and Mod-U-Kraf shared common directors and officers; that Mr. Schafer and Mr. Kurth, Coachmen's president and representative, were intimately and directly involved with negotiations regarding the Project and provided assurances that the Project would be completed; that Coachmen forwarded a form to Winforge and McMahon seeking to release all three Coachmen-related entities from liability; and numerous other factors.  Based on these circumstances,

Winforge argues that Coachmen specifically directed Mod-U-Kraf's actions, and ultimately itself undertook to perform Mod-U-Kraf's contractual obligations.

Defendants rejoin that Winforge's reliance on Esmark is misplaced, and cite the Seventh Circuit's statement in that case that: "Parents and dominant shareholders are almost always 'active participants' in the affairs of an owned corporation. . . . [I]n the usual case, the exercise of such control over a subsidiary's actions . . . does not result in the owner's personal liability." Esmark, 887 F.2d at 759. As such, Defendants assert, Esmark stands for the proposition that liability may only be imposed on a parent company which directly participates in the *wrongful acts* of its subsidiary. Defendants do not dispute that Coachmen's president and other personnel were closely monitoring Mod-U-Kraf's actions with respect to the Project, and were "urging, even directing, Mod-U-Kraf's and [All American]'s officers to do whatever was necessary to move the project forward." Defs.' Resp. at 25. However, they assert, Coachmen's actions in this regard were *helpful*, not wrongful, and Coachmen took no actions "directing Mod-U-Kraf and [All American] to drag their feet" or otherwise stall the Project. Id. Therefore, Defendants argue, direct participant liability is inapposite here.

We do not read Esmark so narrowly as Defendants interpret it. The Esmark court's thorough opinion clearly contemplates potential liability for a parent company's involvement in a *transaction*, and we are unconvinced by Defendants assertion that Coachmen would have had to commit so specific a "wrong" in the course of that transaction in order to incur liability. See Esmark, 887 F.2d at 755-56 ("One corporation

29

may . . . become an actor *in a given transaction*, or in part of a business, or in a whole business, and, when it has, will be legally responsible.  To become so it must take immediate direction *of the transaction* through its officers[.] . . . [L]iability ordinarily must depend upon the parent's *direct intervention in the transaction*, ignoring the subsidiary's paraphernalia of incorporation, directors and officers." (quoting Kingston Dry Dock Co. v. Lake Champlain Transp. Co., 31 F.2d 265, 267 (2nd Cir. 1929)) (emphasis added).  As such, the clear emphasis of Esmark is transaction-specific.  There is no doubt that Coachmen's officers and representatives participated in Mod-U-Kraf's transaction with Winforge at a level beyond normal parent company oversight; it was directly involved in the Project, and admits as much.  Thus, the direct participant doctrine is appropriate here, and we hold that Coachmen may be held liable for Mod-U-Kraf's possible breach of the Development Agreement.

### III.    Count Eight and Coachmen's Counterclaim: Plaintiffs' Obligations Under the Loan Documents

In Count Eight of the Complaint, Plaintiffs seek a declaratory judgment defining their rights and obligations under the Loan Documents.  Plaintiffs believe they have no further obligations under the Loan Documents due to Mod-U-Kraf's breach of the Development Agreement and the conduct of the other Defendants.  Defendants bring a counterclaim seeking to collect amounts it asserts are due under the Loan Documents,

asserting that any breach of the Development Agreement would not relieve Plaintiffs of such obligations.

### A.    Whether the Development Agreement and Loan Documents Constitute One Contract

Of central importance to the resolution of this aspect of the parties' dispute is whether the Development Agreement, executed by Mod-U-Kraf, should be construed together with the Loan Documents, executed by Coachmen, as part of a single contract; if they are, Plaintiffs assert that they have no obligations to Coachmen under the Loan Documents because Coachmen breached the singular contract first by failing to perform its obligations under the Development Agreement.  A party that materially breaches a contract may not then seek to enforce the contract against the other party.  See Henthorne v. Legacy Healthcare, Inc., 764 N.E.2d 751, 758 (Ind. Ct. App. 2002).

Plaintiffs assert that the Development Agreement and the Loan Documents should be construed together, citing the "contemporaneous documents rule."  This rule establishes that, in the absence of an indicator of contrary intention, "documents executed simultaneously as part of a single transaction will be construed together as one instrument." Conner v. Instant Cash Advance, 2003 WL 446197, at *3 (S.D. Ind. 2003) (Barker, J.).  See also Salcedo v. Toepp, 696 N.E.2d 426, 435 (Ind. Ct. App. 1998) ("In the absence of anything to indicate a contrary intention, writings executed at the same time and relating to the same transaction will be construed together in determining the

contract."). The application of the contemporaneous documents rule is fact-dependent. Ruth v. First Fed'l Savings and Loan Ass'n of LaPorte County, 492 N.E.2d 1105, 1107 (Ind. Ct. App. 1986).

Plaintiffs argue that the Loan Documents and Development Agreement constitute a single contract because they were entered into on the same date, relate to the same transaction, and reference and relate to one another – in fact, the Loan Agreement explicitly required Winforge to enter into the Development Agreement, and cites certain events of default under the Development Agreement as an event of default for purposes of the Loan Agreement. Moreover, Plaintiffs assert, Coachmen's conduct and intimate involvement with the Project demonstrate that the documents form one contract.[17]

Defendants rejoin that the Loan Agreement contains a provision which explicitly asserts that Coachmen, as Lender, is "not responsible for construction of the Project. . . . LENDER HAS NO RESPONSIBILITY FOR THE QUALITY OF CONSTRUCTION, OR WORKMANSHIP, OR FOR THE ADHERENCE TO THE PLANS AND SPECIFICATIONS FOR PROJECT. . . . LENDER DOES NOT INTEND TO BE AND IS NOT AND WILL NOT BE RESPONSIBLE FOR . . . THE COMPLETION OF ANY IMPROVEMENTS ERECTED OR TO BE ERECTED UPON THE REAL ESTATE[.]" Loan Agreement ¶¶ 10.11, 10.11(a). Accordingly, Coachmen argues, the Loan

---

[17] Plaintiffs alternatively argue, quite cursorily, that Coachmen modified its duties to include the manufacture of the modular units, drawings, and approvals by means of "written instrument or superseding agreement" pursuant to Paragraph 10.4 of the Loan Agreement. It is unclear to us what modification of the Loan Documents Plaintiffs refer to, and we need not pursue this skeletal line of argument.

Agreement should be construed separately from the Development Agreement governing construction of the modular units.

We agree with Coachmen.  Though the Development Agreement and the Loan Documents certainly "[bear] some relationship to each other" (Utopia Coach Corp. v. Weatherwax, 379 N.E.2d 518, 522 (Ind. Ct. App. 1978)), and were made effective on the same date, such evidence "is by no means unequivocal that the two were intended to be construed together[.]"  Id.  The contemporaneous documents rule is applicable in the "absence of an indicator of contrary intention"; however, the clause reproduced above is clear evidence that Coachmen specifically intended for its obligations under the loan documents to be wholly separate from Mod-U-Kraf's obligations under the Development Agreement.

We note that this finding is not inconsistent with Coachmen's direct participant liability for the obligations of Mod-U-Kraf discussed in Count Seven.  Though we held that Coachmen directly participated in Mod-U-Kraf's contractual obligations under the Development Agreement and might incur liability for a breach of those obligations, Coachmen's contractual obligations as Lender under the Loan Agreement are separate. The fact that Coachmen could incur liability under both documents does not necessitate that the two documents be construed as a singular contract.

Accordingly, Plaintiffs' obligations to Coachmen under the Loan Documents remain, regardless of whether the Development Agreement was breached by Mod-U-Kraf or Coachmen (as a direct participant in the transaction).  We therefore DENY summary

33

judgment for Plaintiffs as to Count Eight of their Complaint, and <u>GRANT</u> summary judgment for Coachmen as to their Counterclaim.


**IV.    Count Nine: Plaintiffs' Claim for Violation of Indiana Code § 32-29-7-3**

Finally, we turn to Count Nine of Plaintiffs' Complaint, which asserts that Coachmen violated Indiana law when it scheduled the real estate for public sale without first filing a complaint commencing a foreclosure proceeding.  Defendants seek summary judgment as to this claim, asserting that it was not required to judicially foreclose on the property, as *Tennessee* law governs the foreclosure sale.

The Loan Agreement and accompanying Promissory Note contain provisions stating that those two documents are to be construed and enforced in accordance with Indiana law.  Loan Agreement ¶ 10.3; Note at 2.  The Deed of Trust contains a provision stating that it is to be construed and enforced in accordance with the laws of the state in which the real estate is located – in this case, Tennessee.  Deed of Trust ¶ 4.4.[18]

As we have described, Coachmen advised Winforge in March 2006 that it would initiate foreclosure proceedings on the property.  Winforge filed this lawsuit in response and sought to enjoin the foreclosure sale; we granted a preliminary injunction[19] in May

---

[18]  As we discussed in our preliminary injunction ruling, these different choice-of-law provisions do not create an internal conflict which might subject all Loan Documents to Indiana law under ¶ 1.3(g) of the Loan Agreement.  <u>See</u> May 26, 2006 Entry at 10-13.

[19]  In our preliminary injunction order, we stated that enforcement of the Deed of Trust (governed by Tennessee law) could not occur without a determination of the parties' rights and obligations under the other loan documents (governed by Indiana law).  Thus, though (we

(continued...)

34

2006 to stay the sale, pursuant on Plaintiffs' posting of a bond.  When Plaintiffs failed to post bond, even after we reduced the required amount thereof, we dissolved the injunction.  The real estate was then sold in November 2006.

Plaintiffs argue that this sale violated Indiana Code § 32-29-7-3, which requires a party to judicially foreclose on a mortgage executed on real estate.  They base this argument on the Loan Agreement's forum selection clause, which provides in relevant part that: "Any action or proceeding concerning this Agreement or the other Loan Documents or the enforcement thereof shall be commenced in the United States District Court for the Southern District of Indiana, and such court shall have the sole and exclusive jurisdiction over any such proceeding."  Loan Agreement ¶ 10.3.  Plaintiffs assert that Coachmen's foreclosure on the Deed of Trust is an "action or proceeding" as contemplated by the Loan Agreement, and therefore should have been brought in this Court.

Coachmen counters that, when read in larger context, it is clear that the term "action or proceeding" refers solely to a "lawsuit or judicial proceeding," not a foreclosure sale (Defs.' Mem. at 11-12), and Coachmen was not required to file any lawsuit or judicial proceeding in order to foreclose under the Deed of Trust – as Tennessee law permits a non-judicial foreclosure.  See T.C.A. § 35-5-501, et seq.[20]

---

[19](...continued)
enjoined a foreclosure sale at that time, we left undecided the issue of whether the statutory foreclosure procedures of Indiana or Tennessee would apply to the sale of the property.

[20]  Coachmen also cites cases holding that the method for foreclosure of mortgages is governed
(continued...)

We are unconvinced by Plaintiffs' argument – unsupported save for definitions from Black's Law Dictionary – that the foreclosure sale constitutes an "action or proceeding" as those terms are used in Section 10.3 of the Loan Agreement.  It is clear to us from the context of the clause that those terms denote only that any *lawsuit* or judicial complaint brought needs to be brought in the courts of this district.  However, we do not, as Plaintiffs do, read this language to create an obligation for Coachmen to bring a complaint in this district prior to foreclosure if it is not otherwise required to bring such a complaint – and Plaintiffs do not dispute that Tennessee law, which governs the foreclosure sale, does not so require.  Thus, we GRANT Defendant's Motion for Summary Judgment as to Count Nine.

**V.     Conclusion**

Therefore, for the reasons we have stated in this entry, Plaintiffs' summary judgment motion is DENIED in its entirety.  Defendants' summary judgment motion is GRANTED as to Counts Eight and Nine and Coachmen's Counterclaim, and DENIED as to Count Seven.

IT IS SO ORDERED.

---

[20](...continued)

by the local law where the real estate is located, regardless of mortgage provisions choosing foreign law.  See, e.g., Fox v. River Heights, Inc., 22 Tenn. App. 166, 186 (1938).

Date: ___08/27/2008___

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Brent Emerson Inabnit
SOPKO NUSSBAUM & INABNIT
brenti@sni-law.com

Christopher M. Keefer
SOPKO NUSSBAUM & INABNIT
chrisk@sni-law.com

Richard Charles Richmond III
TAFT STETTINIUS & HOLLISTER LLP
rrichmond@taftlaw.com