IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WINFORGE, INC., | ) | |
| a North Carolina corporation, and | ) | |
| BYRON McMAHON, a | ) | |
| North Carolina citizen, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-CV-0619-SEB-JMS |
| | ) | |
| COACHMEN INDUSTRIES, INC., an | ) | |
| Indiana corporation, | ) | |
| ALL AMERICAN HOMES, LLC, a | ) | |
| Virginia corporation, and | ) | |
| MOD-U-KRAF HOMES, LLC, a | ) | |
| Virginia corporation, | ) | |
| Defendants. | ) | |

**PLAINTIFFS' POST-TRIAL BRIEF**

Beginning February 1, 2010 and continuing through February 4, 2010, this matter

proceeded to a bench trial.  Following the Court's August 27, 2008 Order on the parties' cross

Motions for Summary Judgment, the remaining claim in this matter was Count VII of Plaintiffs'

Complaint for breach of contract.  The plaintiffs, Winforge, Inc. ("Winforge") and Byron

McMahon ("McMahon") were represented by Brent Inabnit and Kevin Warren.  The Defendants,

Coachman Industries, Inc. ("Coachmen"), All American Homes, LLC ("AAH") and Mod-U-Kraf

("MUK"), were represented by Todd Woelfer and Georgianne Walker. Both sides presented

evidence. Based upon the evidence presented, the Court should enter judgment in favor of

Winforge on Count VII of Plaintiffs' Complaint.  Below are specific Findings of Fact and

Conclusions of Law that support the entry of judgment.

**Jurisdiction**

1.      The Court has jurisdiction over this matter based on 28 U.S.C. § 1332(a) and (c)

as an action between citizens of different states seeking money damages in excess of Seventy-five

Thousand Dollars ($75,000.00).

**Virginia Law Applies to the Contract Claim**

2.      In an action tried without a jury, the Court is the fact finder and makes all

decisions regarding witness credibility and the weight of evidence.  Fed. R. Civ. P. 52(a);  *Elda*

*Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 709 (7th Cir. 2002).

3.      Pursuant to the Development Agreement at issue in this matter, the Court should

apply Virginia law to resolve the contract claim.  (Plaintiffs' Exhibit 29, p. 11).[1]

**Findings of Fact**

**The Parties**

4.      Winforge is a North Carolina corporation.  (Trial Tr. vol. I,  321, Feb. 1, 2010).[2]

Winforge has two shareholders, McMahon and Donny Thomas ("Thomas").  (Tr. 321-322).

McMahon is an 80 percent shareholder of Winforge and Thomas is a 20 percent shareholder.  (Tr.

322).[3]  Winforge was formed to develop a hotel project in Pigeon Forge, Tennessee (the

_____

[1]      Reference to Plaintiffs' exhibits hereinafter will be designated as "Pl. Ex." followed
by the exhibit number.

[2]      References to the Trial Transcript hereinafter will be designated as "Tr." followed
by the appropriate page number.

[3]      It is customary in the hotel industry for a landowner to contribute land for the
development of a hotel in exchange for obtaining a 20 percent interest in the company that owns
the hotel.  (Tr. 322).  In April, 2004, Donny Thomas and his wife, transferred property they
owned in Pigeon Forge, Tennessee to Winforge by way of a warranty deed.  (Tr. 338-339; Pl. Ex.
28).  In exchange, Thomas received a 20 percent interest in Winforge.  (Tr. 338).

"Project").  (Tr. 321).

5.      McMahon is 48 years old and resides in Athens, Greece.  (Tr. 312-313).  From

2003 to 2006, McMahon resided in North Carolina.  (Tr. 314).[4]

6.      In 1983, McMahon graduated from the University of Essex in Colchester, United

Kingdom, with a degree in psychology, anthropology, and sociology.  (Tr. 314).

7.      McMahon has spent most of his life working in the hotel industry.  (Tr. 315).

McMahon began working in the hotel industry through his family's business when he was 14

years old.  (Tr. 315-316).

8.      After graduating from college, McMahon began working for Commercial

Management Corporation in Charlotte, North Carolina.  (Tr. 314-315).  Commercial Management

Corporation was in the business of developing and managing hotels in the Southeastern United

States.  (Tr. 315-316).  In this role, McMahon opened new hotels, installed computer systems,

and worked with management on various matters.  (Tr. 316).

9.      Subsequently, McMahon acquired from Cendant the franchise rights to the Days

Inn brand for the United Kingdom.  (Tr. 316).  From 1986 through the early 1990's, McMahon

lived in England and was involved in the financing and construction of hotel projects.  (Tr. 317).

During this time period, McMahon developed a 347-room, 12-story hotel in London.  (Tr. 317-

---

[4]      At the close of the Plaintiffs' evidence, the Defendants moved to dismiss any
personal claims McMahon had against the Defendants.  (Tr. 431).  Plaintiffs acknowledged that
McMahon was not seeking damages under Count VII of the Complaint.  (Id.).  Instead,
McMahon was seeking to have the judgment against him extinguished because MUK breached
the Development Agreement.  (Id.).  Based upon the foregoing, the Court dismissed any personal
claim made by McMahon under Count VII. (Tr. 433).  The Court did not, however, foreclose
Winforge's claim for damages or the way in which McMahon might benefit from a judgement in
favor of Winforge. (Id.)

318).  At the time that McMahon's involvement ended, the project was approximately 75 percent complete.  (Tr. 318).

10.     In the early 1990's, McMahon returned to the United States and served as President of Southeast Hotel Management.  (Tr. 318-319).  McMahon's duties and responsibilities included the development and operation of new hotels.  (Tr. 319).  During his employment at Southeast Hotel Management, McMahon developed three hotels: (a) a 134-room Wingate Inn in Lynchburg, Tennessee; (b) a 60-room Super 8 hotel in Bedford, Virginia; and (c) a 60-room Holiday Inn Express in Altavista, Virginia.  (Tr. 319-320).

11.     McMahon is a "preferred client" to Cendant, one of the largest hotel franchisers in the world.  (Tr. 322).[5]  There are approximately 16 to 18 hotel developers worldwide that hold Cendant's preferred client status.  (Tr. 323).  Cendant is the franchiser of Wingate Hotels, the franchise that was to be utilized for the hotel in Pigeon Forge, Tennessee.  (Tr. 322, 333).

12.     Coachmen is an Indiana Corporation which, from 2003 to 2006, was in the business of manufacturing recreation vehicles and modular buildings.  (Tr. 672).  During this time period, Coachmen was the parent company of Coachmen Operations, Inc.  (Tr. 672-73, 703).  Coachmen Operations, Inc., was, in turn, the owner of MUK and AAH.  (Id.).

13.     MUK is a Virginia Corporation, in the business of manufacturing modular units for use in the construction of residential houses and commercial buildings.  (Tr. 434, 504).

14.     AAH is a limited liability company, in the business of manufacturing modular units. (Tr. 672-673).  AAH owned subsidiaries in several locations including, among others, All American Homes of Indiana, LLC, All American Homes of Tennessee, LLC and All American

---

[5]     Cendant is now known as Wyndham Hotel Group.  (Tr. 323).

Homes of North Carolina, LLC.  (Id.).

## Lee's Background

15.     Michael Lee ("Lee") is 64 years old and resides in Vienna, Virginia.  (Tr. 33).  Lee is the owner and principal of Lee & Associates.  (Tr. 48).

16.     In 1970, Lee graduated from Georgetown University with a degree in marketing. (Tr. 33).  Lee was employed by American Airlines while he attended Georgetown University and continued working for American Airlines following his graduation.  (Tr. 34).  After graduating, Lee was responsible for the development of American Airlines' travel agency and corporate business.  (Tr. 34).

17.     In 1972, American Airlines entered the hotel business and Lee became the Regional Director of American Airlines' hotel company, Flagship Hotels, which subsequently became known as Americana Hotels.  (Tr. 34).

18.     Through 1986, Lee directed the sales and marketing of Americana Hotels in New York City, the Caribbean, and Palm Springs.  (Tr. 35-36).  By the early 1980's, Lee became a Senior Vice-President of the company.  (Tr. 35-37).  Lee was responsible for the sales, marketing, and advertising of 40 hotels worldwide. (Tr. 37). Lee was also responsible for the growth of the company's hotel business.  (Tr. 37).

19.     Subsequently, Lee worked for the Wyndham Hotel Company.  (Tr. 38).  At Wyndham, Lee was in charge of growing the company's hotel business.  (Tr. 39).  Lee's duties and responsibilities included finding land to acquire for the construction of new hotels, as well as finding existing hotels to convert to the Wyndham brand.  (Tr. 39-40).  In a short period of time, Wyndham went from operating 5 or 6 hotels to operating 14 hotels.  (Id.).

20.     From 1988 until 1990, Lee owned and operated a company called Flagship Hospitality, which managed and developed hotels.  (Tr. 40-41).

21.     From 1990 until 1993, Lee served as a Senior Vice-President and board member for Resorts International, where he was responsible for the worldwide marketing of the company's hotel and casino business in the Bahamas.  (Tr. 41-42).

22.     Lee left Resorts International in 1993, and joined Days Inn, where he was responsible for growing the number of Days Inn hotels throughout the western United States. (Tr. 42-43).  During his tenure with Days Inn, Lee increased the number of Days Inn hotels by more than 1,000 hotels.  (Tr. 43).  The increase included new construction, as well as the conversion from other hotel brands to the Days Inn brand.  (Tr. 44-45).

23.     In 1996, Lee joined Hospitality Franchise Systems, where he was an Executive Vice-President and an officer for the company's Howard Johnson and Ramada Inn brands.  (Tr. 47).  In this capacity, Lee developed new hotels and was in responsible for the company's design and construction departments.  (Tr. 47).

24.     Around 2001, Lee formed Lee & Associates.  (Tr. 47-48).  Lee & Associates is a consulting company that assists hotel clients with the development and operation of new hotels. (Id.).

25.     Lee has in excess of 40 years experience in the hotel industry.  (Tr. 53).  Lee has received numerous awards through industry publications and within the companies where he was employed.  (Id.).  Lee has also taught courses involving the hotel industry.  (Tr. 34).

6

**Lee's Investigation and Pre-Contract Communications**

26.     In 2002, Lee began investigating the potential of building a hotel with modular units.  (Tr. 54).  Lee believed that modular construction had tremendous potential for the hotel industry based upon the time frames in which a hotel can be built, the increased revenue stream that results from the shortened construction time period, and the cost savings of modular construction.  (Tr. 60).

27.     During the course of Lee's investigation, Lee spoke with Dan Brown ("Brown"), a sales representative at MUK.  (Tr. 54-55).  From Brown, Lee learned that MUK was in the process of bidding on the construction of a Hampton Inn.  (Tr. 55-56, 58).   Lee also learned from Brown that MUK was affiliated with AAH.  (Tr. 56).  Lee conducted additional research and learned that MUK and AAH were subsidiaries of Coachmen, a New York Stock Exchange Company.  (Id.).

28.     In the Fall of 2002, Lee, Brown and Jeff Powell ("Powell") met at MUK's Virginia facility.  (Tr. 56-57).[6]  At this meeting, Lee learned that MUK had bid on several hotel projects, but was consistently not able to get the work.  (Tr. 58).  Lee explained to Brown and Powell that the reason they were not successful was because MUK did not have a model to show prospective hotel clients.  (Tr. 58-59).

29.     Lee proposed a long-term program in which MUK would construct model hotels within an approximately 100-mile radius of a factory that would be used to demonstrate the quality of modular construction.  (Tr. 59).  During these discussions, Powell told Lee that MUK had previously built one hotel.  (Tr. 64).  Lee saw photographs of this hotel and stated this hotel

---

[6]        Powell is the Vice-President and General Manager of MUK.  (Tr. 434).

would not have qualified for most franchises.  (Id.).[7]

30.    A second meeting was held at MUK's Virginia facility that included Coachmen's Executive Vice-President, Steve Kerr ("Kerr"), who was also the President of AAH, and Joseph Tomczak ("Tomczak"), Coachmen's Chief Financial Officer.  (Tr. 61).  At this meeting, Brown made a PowerPoint presentation that outlined the benefits of hotel modular construction.  (Tr. 71-72; Pl. Ex. 5B).

31.    In the presentation, MUK represented that the construction of modular units for a hotel could be completed within five weeks.  (Tr. 74; Pl. Ex. 5B).  MUK also emphasized that it would obtain "State Approval [and] Third Party Approval."  (Id.).  MUK indicated that guest rooms would be delivered with the structure 100% complete, the mechanical 90% complete, carpet 100% installed and electrical 90% complete.  (Pl. Ex. 5B.).

32.    The presentation also included the following timelines: "Plan Approval: 4 weeks; Off-Site Construction 5 weeks; Delivery 1 week; Product Set 1 week." (Id.). The presentation concluded with the statement "80% complete Hampton Inn 11 weeks."  (Id.).

33.    In November of 2002, Lee wrote a letter to John Trant, a Coachmen representative, outlining the broad parameters of a business relationship through which Coachmen would provide the equity for a project, MUK would be awarded the contract to supply modular unites and Lee & Associates would be responsible for development work and the sale of the completed hotel.  (Tr. 60; Pl. Ex. 253).  At the time, the communication between the parties focused on a location in Mt. Airy, North Carolina.  (Tr. 62, 66; Pl. Ex. 253).

---

[7]    MUK had very little experience in building hotels and no experience with building a hotel in the State of Tennessee.  (Tr. 506-508).

34.     In the Spring of 2003, Lee learned that Coachmen would not agree to the structure he previously outlined because Coachmen did not want to own the hotel. (Tr. 66-67). However, Lee was told that there was no objection to a business relationship in which Coachmen was the lender for a project. (Tr. 67).

**Pigeon Forge, Tennessee**

35.     Lee had contacts within several large hotel companies, including Cendant. (Tr. 67). Lee contacted Cendant and described the benefits of modular hotel construction and the communications that he had with MUK representatives. (Tr. 67).

36.     In April, 2003, Lee wrote a letter to Kerr, Tomczak and Powell, and indicated that Cendant highly recommended a company owned by McMahon, Matrix Hospitality. (Tr. 67-69; Pl. Ex. 1). Lee also indicated that Matrix had access to land in Pigeon Forge, Tennessee. (Tr. 68; Pl. Ex. 1).

37.     Subsequently, in the Spring of 2003, McMahon and Thomas met Lee, Kerr and Powell for the first time at a factory tour. (Tr. 324-326). McMahon was impressed by the potential of modular construction. (Tr. 326). McMahon was convinced that the benefits of modular construction included the speed at which construction would be completed and the quality control improvements that arise because each room is shipped complete. (Tr. 327-328).

38.     As a result of the parties' communications, on June 24, 2003, Powell and McMahon signed a letter of intent outlining a preliminary understanding between MUK, Matrix, and Coachmen with regard to the construction of a modular hotel in Pigeon Forge. (Tr. 335; Pl. Ex. 5).

**Scope of Work Negotiations**

39.     From around July 8, 2003 until April 13, 2004, the parties discussed and exchanged a document entitled "Scope of Work." (Tr. 678-679).  The discussions regarding this document were held, for the most part, between Powell and Lee, and were reduced to writing by Powell.[8]  (Id.).  Kathy Samovitz ("Samovitz") was provided information regarding revisions to the Scope of Work, but was not involved directly in the discussions regarding the Scope of Work. (Tr. 705).[9]

40.     The Scope of Work document was revised ten times before being included as an exhibit to the parties' final agreement.  (Tr. 511-514; Pl. Ex. 7; 11; 13; 14; 15A; 24A; 25A; 29).

41.     During the negotiations, the parties verbally agreed that MUK's responsibilities included everything associated with the building to a point five feet outside the building.  (Tr. 91). Winforge was to be responsible for the area outside of this point.  (Tr. 91).

42.     Specifically, the parties agreed that MUK's responsibilities included generating all plans that would be required for the building itself.  (Tr. 93).  Lee stated that, in the final signed Scope of Work, the parties' agreement on this point was reflected in Section 1.3.  (Tr. 94-95).

43.     Beginning with the Scope of Work revision dated August 6, 2003 through the final version, Section 1.3 of the Scope of Work provided:

> "MUK shall provide modular units and material noted on plans for installation and completion of Wingate Inn. **This will include all architectural drawings, structural calculations for modular unit construction, mechanical, electrical systems for modulars,**

---

[8]     During this period, Lee also communicated with McMahon regarding Scope of Work and its revisions.  (Tr. 337).

[9]     At the time, Samovitz was associate counsel at Coachman.  (Tr. 672).

**and sprinkler system.**" (Pl. Ex. 15A; 24A; 25A) (Emphasis added).

44.     The parties also verbally agreed that MUK's responsibilities included getting franchiser, third-party, state, and local approvals. (Tr. 125-127). Lee stated that in the final signed Scope of Work, the parties' agreement on this point was reflected in Section 1.2. (Tr. 127). Throughout the negotiations regarding the Scope of Work, Section 1.2 provided:

> "MUK shall manufacture units at the MUK manufacturing facilities in accordance with approved Specifications and Drawings. **Drawings to meet local, state, 3rd party and franchiser requirements.**" (Pl. Ex. 7; 11; 13; 14; 15A; 24A; 25A; 29) (Emphasis added).

45.     The parties further agreed that MUK was responsible for the hotel's fire suppression system. (Tr. 133; Pl Ex. 16). In all ten drafts of the Scope of Work leading to the final signed Scope of Work, Section 10 provided:

> **"MUK will provide subcontractor for design and installation of Sprinkler System."** ( Pl. Exh. 7; 11; 13; 14; 15A; 24A; 25A; 29) (Emphasis added).

46.     There are no provisions in the final Scope of Work that required Winforge to generate plans and/or drawings for the hotel building. (Pl. Ex. 25A).

47.     On August 5, 2003, a conference call was held between Lee, Powell, and others. (Tr. 95-99; Pl. Ex. 15). The summary of this meeting cross-referenced a Construction Cost Forecast Report. (Pl. Ex. 15, 16). According to the Forecast Report, MUK was responsible for "Architectural Services," "Mechanical Engineering," "Electrical Engineering," "Structural Engineering," "Architectural Printing and Reprographics," as well as "Fire Protection," and "Fire Protection Systems." (Pl. Ex. 16). In the summary of this call, it was noted with respect to

Architectural Services, Mechanical Engineering, and Electrical Engineering, that "MUK [would]

draw up to 5' outside the building."  (Pl. Ex. 15).[10]

### The Flagship Agreement

48.     On August 14, 2003, McMahon entered into an agreement with Flagship

Construction Management Group ("Flagship").  (Tr. 330-331; Pl. Ex. 19).  Pursuant to the

agreement, McMahon understood that Lee "would be responsible for the aspects of the project

that [Winforge] would be responsible for."  (Tr. 331).

49.     The agreement required Flagship to, among other things, coordinate with project

professionals, establish lines of communication with inspection agencies "including 3rd party

inspectors for MUK," do budget pricing, coordinate with MUK and with lender, as well as a

series of responsibilities during construction that included coordinating the draw schedule,

reviewing change orders, reviewing drawings, and inspecting work.  (Pl. Ex. 19).

50.     Significantly, Flagship was not hired to prepare any plans for the hotel building.

(Tr. 332).

### The Franchise Agreement and Cendant's Plan Review

51.     In June of 2003, AAH made a presentation to Cendant that was similar to the

PowerPoint presentation made at MUK in the Fall of 2002.  (Tr. 80-83).  Arlene Gavin ("Gavin")

attended the meeting on behalf of Cendant.  (Tr. 81).  Gavin was employed by Cendant and was

responsible for design and construction of Cendant's Wingate brand.  (Tr. 81).  At the meeting,

Kerr assured Wingate representatives that the modular construction of Wingate's prototype hotel

---

[10]     The Defendants produced additional documents which made clear that AAH's
obligations included responsibility for state submittal drawings. (Pl. Ex. 75A, 76D, 76E, 77B).

would fully conform to Wingate's standards.  (Tr. 84).  At the conclusion of the meeting, Wingate

agreed to send its prototypical plans to MUK.  (Tr. 85).

52.     Subsequently, MUK received the Wingate plans and began reworking them for

modular construction.  (Tr. 110).  Thereafter, MUK sent the plans to Gavin for her review.  (Tr.

110, Pl. Ex. 20A).

53.     On September 19, 2003, Gavin faxed a preliminary plan review to McMahon,

MUK Senior Vice-President, Frank Hodges, and Deb Studtman ("Studtman").  (Pl. Ex. 20A).[11]

In the letter, Gavin indicated a number of areas that required correction in order to achieve

Wingate approval.  (Id.).

54.     On September 28, 2003, Winforge entered into a Franchise Agreement with

Wingate Inns for the Pigeon Forge, Tennessee location.  (Tr. 332, Pl. Ex. 23 p. 1).  Pursuant to

the agreement, Winforge was obligated to commence construction of the hotel by June 15, 2004

and complete construction within 12 months.  (Pl. Ex. 23 p. 1). The agreement further required

Winforge to pay a franchise fee to Wingate in the amount of $36,000.  (Pl. Ex. 23 p. 10)

55.     On November 3, 2003, MUK sent revised plans to Gavin.  (Pl. Ex. 24C).  On

November 24, 2003, Gavin sent another letter to McMahon, Hodges, Studtman, and Lee detailing

deficiencies with the plans.  (Pl. Ex. 24C).

---

[11]     Studtman is an architect.  (Def. Ex. W/14; Pl. Ex. W/14-CD).  Kerr contacted
Studtman and asked her if she "could be the architect of record for the modular portion" of the
Pigeon Forge project.  (Pl. Ex. W/14-CD).  She indicated that she would be interested in doing
so.  (Id.).  Studtman was not retained by AAH.  (Tr. 236).

## The Development Agreement

56.     On April 5, 2004, Samovitz prepared and sent a draft of the Development

Agreement to Lee. (Tr. 115).[12]   Lee reviewed the Development Agreement. (Tr. 116).  Based

on his review, Lee concluded that the agreement was consistent with the parties' verbal

agreement that MUK was responsible for designing the building to a point five feet out from its

exterior walls and that Winforge was responsible for the balance of the site work outside of this

point. (Tr. 118).

57.     Throughout the period between the signing of the Letter of Intent and the signing

of the Development Agreement, McMahon had several conversations with Kerr and Lee. (Tr.

336-337).  As a result of these conversations, McMahon understood that MUK's responsibilities

included creating the plans and building the units that would comprise the hotel. (Tr. 335 - 336).

McMahon further understood that Winforge's responsibilities primarily regarded the area outside

of the building.  (Tr. 335-336).

---

[12]     At the time Samovitz prepared the Development Agreement, she had been a
licensed attorney for less than three years. (Tr. 706-707).  Before becoming employed by
Coachmen, Samovitz was an associate at May, Oberfell and Lorber. (Tr. 706). As an associate,
Samovitz did some contract work, but primarily handled insurance defense cases. (Id.).  Samovitz
had never previously been involved with a contract that involved modular units and hotel
construction. (Tr. 707).  In order to prepare the Development Agreement, Samovitz used an
existing form from the Coachman legal department. (Tr. 707).  This form did not involve a hotel
project or the use of modular components in hotel construction. (Tr. 707).  In completing the
Development Agreement, Samovitz did not confer with others in the Coachmen legal department
or with Summer Barnard, the outside firm that was hired to prepare the Loan Agreement. (Tr.
708).  In total, Samovitz spent no more than a half day and as little as an hour and a half preparing
the Development Agreement. (Tr. 709).  In addition, Samovitz did not conduct any due diligence
regarding the requirements of Cendant, the third-party review agency, the State of Tennessee, or
Pigeon Forge. (Tr. 709). This failure is especially significant based on the fact that Coachmen had
experienced delays in modular building projects in the past. (Tr. 726-729).  These delays were
significant enough that Coachmen regularly reported them in its filings with the Securities and
Exchange Commission. (Tr. 727; Pl. Ex. 214 p. 7; 221 p. 5, ).

14

58.     Prior to execution, McMahon reviewed the Development Agreement and concluded that it was consistent with the understanding of the parties' respective roles that he had discussed with Kerr and Lee.  (Tr. 338).

59.     At the time that the Development Agreement was signed, McMahon also sought assurances from MUK regarding the status of the plans.  (Tr. 339).  McMahon was assured by MUK that the plans were finished and that MUK was ready to begin production of the units.  (Tr. 339).

60.     The completion of the plans was very important to McMahon.  (Tr. 341).  Under the accelerated time frames anticipated by the parties, McMahon was responsible for hiring and training hotel management and staff, creating promotional materials, conducting sales blitzes, scheduling open houses, and coordinating activities with the franchiser.  (Tr. 340).

61.     The Development Agreement was entered into between McMahon on behalf of Winforge, and Powell on behalf of MUK, with an effective date of April 13, 2004.  (Pl. Ex. 29).

62.      Pursuant to the Development Agreement, MUK was obligated to prepare the plans for the hotel building. (Pl. Ex. 29, Exhibit A, Section 1.3).

63.     Pursuant to the Development Agreement, MUK was obligated to have the plans approved by the franchiser, third-party review agency, and state and local authorities.  (Pl. Ex. 29, Exhibit A, Section 1.2)

64.      Pursuant to the Development Agreement, after the plans were prepared and approved, MUK was obligated to build and deliver modular units. (Pl. Ex. 29, Exhibit A, Section 1.3, Section 2.1).

65.     MUK was obligated to complete all three phases of its responsibilities on or before

15

December 31, 2004.  (Pl. Ex. 29, Exhibit D).

66.     There are no provisions in the Development Agreement that required Winforge to generate plans and/or drawings for the hotel building. (Pl. Ex. 29).

### MUK Did Not Conduct Any Due Diligence

66.     Prior to assuming the obligations set forth in the Development Agreement, MUK did not conduct any due diligence to determine the nature and/or extent of the obligations it had agreed to perform. (Tr. 517).  Powell was the General Manager of MUK and the person at MUK in charge of the Project.  (Tr. 434).[13]

67.     Powell did not have any communication with the third party review agency, T.R. Arnold & Associates ("TRA"), prior to April 13, 2004 regarding the Project.  (Pl. Ex. 225).

68.     Powell was not aware of one single person at MUK that had any communication with TRA prior to April 13, 2004 regarding the Project.  (Tr. 517).

69.     Powell did not have any communication with any employee of the State of Tennessee prior to April 13, 2004 regarding the Project.  (Tr. 516-517).

70.     Powell was not aware of one single person at MUK that had any communication with any employee of the State of Tennessee prior to April 13, 2004 regarding the Project.  (Tr. 516-517).

71.     Powell did not have any communication with any employee of the Pigeon Forge municipality prior to April 13, 2004 regarding the Project.  (Tr. 517).

72.     Powell was not aware of one single person at MUK that had any communication

---

[13]     Powell is not an architect or engineer. (Tr. 505). There were four individuals employed by MUK who worked on the Project. (Id.).  None of these individuals were an architect or engineer. (Id.).

with any employee of the Pigeon Forge municipality prior to April 13, 2004 regarding the Project. (Tr. 517).

### The Loan Agreement

73.     On April 14, 2004, Winforge and Coachmen entered into an agreement whereby Coachmen agreed to provide financing for the Project ("the Loan Agreement").  (Pl. Ex. 30).[14] The construction loan was for a period of 150 days.  (Pl. Ex. 30, Section 2.1).  McMahon understood that this time frame was based upon the amount of time anticipated for the completion of the hotel project.  (Tr. 345).

### Winforge Begins Work with the Understanding that the Plans Are Complete

74.     On April 22, 2004, Gavin sent an e-mail to Lee summarizing a phone conference held between her and representatives of MUK.  (Pl. Ex. 36).  Gavin related that she was advised by MUK that the "Drawings [were] 100% complete." (Id.).  She provided the time frames of two weeks for independent engineer review; one to two weeks for third party professional engineer; and two weeks for State of Tennessee review.  (Id.).  Gavin further indicated that after two to three weeks for scheduling and set-up for production, units would be under construction by July 1, 2004.  (Id.).

75.     Based upon the time frames reflected in Gavin's e-mail and representations made by MUK regarding MUK's intent to begin production of the units, Winforge began the on-site work that it was obligated to complete. (Tr. 130).

76.     Specifically, Winforge hired Barry Olpp as a site superintendent.  (Tr. 130).  In

---

[14]     In addition to the Loan Agreement, a Promissory Note, Security Agreement and Gaurantee were also executed. (Pl. Ex. 31, 32, 34).

addition, on May 2, 2004, Winforge entered into an agreement for site engineering and design services with Vision Engineering. (Tr. 131; Pl. Ex. 37). On May 7, 2004, Winforge also entered an agreement for foundation engineering with Milligan Engineering. (Tr. 132; Pl. Ex. 38A).

**MUK Unilaterally Transfers its Contractual Obligations to AAH**

77.     In June, 2004, Lee learned that the plans were not complete during a telephone phone call with various people, including Kerr. (Tr. 135). Kerr was shocked that MUK had not completed the plans. (Tr. 135). Because MUK was not performing its contractual obligations and because AAH needed work for its Tennessee factory, Kerr unilaterally transferred the Project to AAH's Tennessee facility. (Tr. 135).

78.     As a result of the transfer, on June 7, 2004, McMahon wrote to Kerr and noted that MUK had committed to beginning production during the first week of July, 2004. (Pl. Ex. 43). McMahon expressed his concern regarding the timing of the Project and inquired whether the Tennessee AAH plant would honor that date. (Id.).

79.     During this same time period, Lee became aware that MUK was having difficulty completing drawings for the fire protection system. (Tr. 134).

80.     In order to accelerate the Project, Winforge agreed to assist MUK in completing the fire protection drawings. (Tr. 134).

81.     On June 17, 2004, McMahon sent an e-mail to Kerr again expressing concerns regarding the timing of the Project. (Pl. Ex. 47). McMahon indicated that the opening date required by Cendant was at risk of being missed. (Id). McMahon stated that the July 2004 date for beginning construction of the modular units did not appear to be feasible. (Id.). As a result, he asked to be provided a new timeline for approvals and production. (Id.). McMahon further asked

18

to be informed as to who was spearheading the Project. (Id.).

82.     In the June 17 e-mail to Kerr, McMahon confirmed that there were no outstanding issues with Cendant or with Winforge's project manager that would prevent MUK from moving forward with the plan approval process. (Id.).

## Proposed Revisions to the Scope of Work

83.     In July, 2004, MUK sent a draft revision of the Scope of Work to Lee. (Tr. 145). The Scope of Work was purportedly revised to address the change in location and the fire protection drawings. (Tr. 523-525).  In response, Lee explained that he could not review the revised Scope of Work without also reviewing a corresponding change to the parties' agreed pricing, along with an approved set of plans.  (Tr. 146).  Finally, Lee requested a red-lined copy of the document illustrating the proposed changes. (Tr. 146).

84.     Lee did not receive revised pricing, approved plans, and a red-lined Scope of Work. (Tr. 145-146). As such, he did not review the revised Scope of Work and did not agree to the revised Scope of Work on behalf of Winforge.[15]

85.     Around September, 2004, Powell sent another revised Scope of Work to Lee. (Tr. 153, Pl. Ex. 73). Lee did not review the document because Powell did not provide a red-lined version illustrating the proposed changes.  (Tr. 153).

86.     At the time that Lee received the September 23, 2004 proposed Scope of Work, the parties had not agreed to a change in the Scope of Work.  (Tr. 156).

87.

---

[15]     A review of the revised Scope of Work reveals that the proposed changes went well beyond addressing the change in manufacturing location and the fire protection drawings. (Tr. 525-526).

**TRA's Experience, Due Diligence and**
**Rejection of the Plans on Three Separate Occasions**

88.    TRA is a third-party review agency approved by the State of Tennessee to conduct

design review of modular projects on behalf of the State.  (Pl. Ex. 228).   The third-party review

agency is hired by the modular manufacturer.  (Pl. Ex. 228).

89.    TRA was hired by AAH to review the plans to ensure that they complied with

Tennessee code. (Tr. 775).[16]  Ray Helmer ("Helmer") was the only individual at TRA responsible

for reviewing plans regarding the Project. (Tr. 750; Pl. Ex. 228).

90.    Helmer had never reviewed plans for a hotel project in the State of Tennessee prior

to his review of the plans TRA received from AAH. (Pl. Ex. 227).

91.    Helmer had never reviewed plans for a project proposed for Tennessee that was of

a similar scale to the Wingate Inn prior to his review of the plans TRA received from AAH.  (Pl.

Ex. 227).

92.    Helmer had no communication with the State of Tennessee or local authorities

regarding the Project prior to approving and submitting plans to the State in October, 2004. (Pl.

Ex. 228).[17]

93.    At some point in June, 2004,  Helmer received the first set of plans regarding the

---

[16]    AAH has been a client of TRA's since 1980. (Tr. 775; Pl. Ex. 228) Coachmen has
been a client of TRA's since 1985. (Id.). TRA's allegiance to AAH and Coachmen became
apparent when Helmer and Bartlett's supervisor, Fred Garbler, engaged in a heated discussion
regarding the State of Tennessee's rejection of the plans TRA submitted in May, 2005. (Tr. 772 -
773; Pl. Ex. 227).

[17]    In fact, no representative from Coachmen, AAH or MUK had contacted the State
of Tennessee to learn, among other things, what code requirements may be applicable to the
Project. (Tr. 709; Tr. 517; Tr. 577; Pl. Ex. 227).

Project. (Tr. 749). Helmer reviewed these plans and issued a deviation report to AAH listing 34 deviations. (Tr. 750; Pl. Ex. 45).[18] The deviations listed on the report indicated instances when the plans included errors and omissions or otherwise failed to comply with Tennessee code. (Tr. 474; Pl. Ex. 228)

94.     Helmer had no communication with anybody regarding the June 15, 2004 deviation report. (Pl. Ex. 228).

95.     Helmer had no further involvement with the Project until July 26, 2004. (Pl. Ex. 228). At that time, Helmer received another set of plans for the Project sent by AAH. (Pl. Ex. 228). Helmer again reviewed the plans and again issued a deviation report, dated July 26, 2004. (Tr. 751, Pl. Ex. 228; Pl. Ex. 65A). This deviation report listed 23 instances in which the plans failed to comply with Tennessee code. (Pl. Ex. 65A).

96.     Helmer had no communication with anybody regarding the July 26, 2004 deviation report. (Pl. Ex. 228).

97.     Helmer had no further involvement with the Project until September, 2004. (Tr. 752; P.l. Ex. 72). At that time, Helmer received a third set of plans for the Project sent by AAH. (Tr. 752). Helmer reviewed the plans and sent yet another deviation report, dated September 22, 2004. (Tr. 752; Pl. Ex. 72). This deviation report listed 5 instances in which the plans failed to comply with Tennessee code. (Pl. Ex. 72).

98.     On September 29, 2004, Carel Whiteside ("Whiteside"), the General Manager of AAH, sent an e-mail regarding TRA's review to Coachmen's president, Matt Schafer ("Schafer").

-----

[18]     Presumably, Cendant had approved plans for the hotel prior to AAH's June 2004 submission to TRA.

(Tr. 528; Pl. Ex. 74). Whiteside noted that the architect hired by MUK had failed to stamp 16 pages of drawings within the plans. (Tr. 529, Pl. Ex. 74).[19]

**The State of Tennessee Rejects the Plans Submitted by TRA**

99.     In October, 2004, Helmer received a set of plans, specifications and calculations from AAH. (Tr. 752; Pl. Ex. 228).  On October 13, 2004, Helmer reviewed the plans, specifications and calculations. (Tr. 752; Pl. Ex. 228; Pl. Ex. 76A). Subsequently, Helmer approved the plans, specifications and calculations and submitted them to the State of  Tennessee. (Tr. 752; Pl. Ex. 228; Pl. Ex. 76A).

100.     Mike Bartlett ("Bartlett") is a Facilities Construction Specialist with the State of Tennessee's Code Enforcement Division. (Pl. Ex. 227).  In that capacity, Bartlett is in charge of the modular building program for the State of Tennessee. (Id.). Bartlett's responsibilities included reviewing all plans for modular construction in the State of Tennessee. (Id.).

101.     Bartlett received the plans and reviewed them together with his supervisor Fred Garbler. (Pl. Ex. 227).

102.     On October 19, 2004, following his review, Bartlett sent an e-mail to Robert Herndon, an attorney for the State of Tennessee seeking his advice regarding these plans.  (Pl. Ex. 227; Pl. Ex. 76F). Bartlett indicated that the plans had multiple problems and were "pretty bad." (Id.).  Around this time, Helmer was told that the State had contacted AAH and indicated TRA was incompetent based on the volume of deviations in the plans. (Pl. Ex. 228).

103.     On October 21, 2004, Bartlett sent a letter to Helmer providing a list of

_____

[19]     The architect, Robert Gregg ("Gregg") was hired by MUK in July 2004. (Tr. 527). At no time during the course of the Project, did Powell ever speak with Gregg. (Tr. 533)

Tennessee's modular building requirements and indicating specific areas in which the plans failed to comply with Tennessee code.  (Tr. 770-771; Pl. Ex. 228(2)).  In addition, Bartlett's letter indicated that: (a) multiple pages of the drawings lacked architect or engineer seals; (b) the proper party, AAH, not MUK, needed to be referred to on the plans; and (c) with regard to the building's mechanical, HVAC, and plumbing systems, the "[b]uilding must be designed as a finished building."  (Id.).

104.    In December, 2004, in response to Bartlett's letter, Helmer issued another deviation report to AAH that simply reiterated the items the State had requested. (Tr. 755-756; Pl. Ex. 228(2)).

105.    It was at this point that MUK and AAH realized that the State of Tennessee required the design of HVAC and other mechanicals be included in the plans and specifications for the hotel building that were not specific to the modular structures before it will approve the plans. (Tr. 220).

**AAH Makes Management Changes and Has Communication Problems**

106.    At the time that the Development Agreement was signed in April, 2004, Powell was charged with the responsibility of completing MUK's contractual obligations.  (Tr. 642).

107.    As of June, 2004, with the transfer to AAH, Carel Whiteside was charged with the responsibility of completing MUK's contractual obligations. (Tr. 643).

108.    During the period in which Whiteside was in charge, Whiteside had difficulty passing along Project information. (Tr. 643, 645-646).   On cross examination, Kurth conceded:

"that the right hand did not know what the left hand was doing. Mike Lee would call and talk to Carel Whiteside think that he, through talking with Carel, informed everybody that needed to know whatever the discussion was about, and that

23

wasn't happening." (Tr. 646).

109.    The communication problem had become so prevalent that Whiteside put an

estimator named Brad Green in charge of disseminating information. (Tr. 645-646).

110.    In January, 2005, Whiteside retired and by the end of the month was not involved

in the Project in any capacity. (Tr. 646).

111.    Around this time, Kurth was assigned to manage AAH's Tennessee plant. (Tr.

646-647).

112.     From the time that Kurth was appointed to replace Whiteside through March

2005, Kurth was not focused on the Project. (Tr. 647).  Instead, Kurth's attention was directed to

a project in Carrabelle, Florida.  (Tr. 605). During this time period, Kurth resided in LaPorte,

Indiana and traveled to the Tennessee plant for a week at a time every other week. (Tr. 647).

**Coachmen Withholds Draw Requests in an Effort to Force
Winforge to Complete MUK/AAH's  Contractual Obligations**

113.    On  February 18, 2005, Samovitz informed Lee that Coachmen intended to

withhold money due to Winforge pursuant to its January 2005 draw request. (Tr. 166-167).

Samovitz indicated that Winforge would be paid  if, and only if, Winforge assisted AAH in

completing AAH's  contractual obligations. (Id.).

114.    On February 18, 2005, Lee confirmed Coachmen's position in an e-mail in which

he wrote, "[t]The balance of the draw which you have withheld ($86,080) will be sent to

Winforge when the items AAH has requested Winforge's assistance on are received by AAH."

(Pl. Ex. 107). These items included the fire alarm system, HVAC common area plans, hot water

plans, and wattage requirement. (Id.). Lee confirmed  "[i]f this is not consistent with your

24

understanding of the terms you set down please advise us." (Pl. Ex. 107).

115.    Samovitz did not respond to Lee's February 18, 2005 e-mail. (Tr. 710).

**Defendants' Retained Architect and Engineer Experience Licensing Problems**

116.    In March, 2005, Kurth was contacted by an investigator for the State of Tennessee named Rick Radcliffe. (Tr. 648; Pl. Ex. 130). The investigator questioned Kurth regarding the engineer, Jay Barlow. (Tr. 648) Specifically, the investigator questioned Barlow's work performance with respect to the Project. (Tr. 648).

117.    In response, Kurth wrote to Radcliffe in order to clarify Barlow's role in the Project. (Pl. Ex. 130).

118.    Additional licensing problems were raised by the State of Tennessee regarding both Barlow, and Robert Gregg.  (Pl. Ex. 137B).   On May 10, 2005, a representative of the State of Tennessee wrote in an e-mail that he and Bartlett had learned that Gregg and Barlow were under investigation by Radcliffe. (Pl. Ex. 137B). The e-mail indicated that Pigeon Forge will not perform review of plans without an assurance that Barlow and Gregg are allowed to seal plans. (Id.).

**The State of Tennessee Rejects TRA's Submittal For a Second Time**

119.    In March, 2005, AAH submitted revised plans to TRA. (Tr. 756- 757).

120.    Helmer reviewed the plans and issued another deviation report to AAH, dated March 11, 2005. (Id.).

121.    In May, 2005, Helmer received another set of revised plans from AAH. (Tr. 757; Pl. Ex. 228)

122.    Helmer reviewed the plans and approved the plans together with the accompanying

specifications and calculations and forwarded them to the State of Tennessee. (Tr. 758: 10-12; Pl. Ex. 228).

123.    Mike Bartlett received the plans, specifications and calculations and reviewed them with his supervisor Fred Garbler. (Pl. Ex. 227).

124.    On May 13, 2005, Bartlett sent a letter to Helmer rejecting the plans submitted by TRA. (Tr. 758).  In this rejection, Bartlett listing 48 instances in which the plans failed to comply with Tennessee code.  (Tr. 758).

125.    On May 16, 2005, Helmer sent a letter responding to each deviation.  (Tr. 759, 761 - 762; Pl. Ex. 227). Bartlett responded to Helmer's letter on May 18, 2005 indicating that the plans continued to include several instances in which the plans failed to meet Tennessee code. (Tr. 759, 761 - 762; Pl. Ex. 227). Among others, Bartlett specifically noted the requirement that all site-finished issues for the completion of the total modular building project must be designed and sealed. (Id.).

126.    On June 30, 2005, AAH re-submitted the calculations and specifications for the Project to TRA. (Pl. Ex. 288). However, AAH did not re-submit a complete set with drawings until around mid-August, 2005. (Id.). On August 29, 2005, Helmer approved the drawings, calculations and specifications and forwarded them to the State of Tennessee. (Pl. Ex. 228).

### The State of Tennessee Issues a Letter of
### Filing and Winforge Applies for a Building Permit

127.    On August 30, 2005, the State of Tennessee issued a Letter of Filing. (Pl. Ex. 227). Upon receipt of the Letter of Filing, AAH was permitted to begin construction of the modular units at its Tennessee plant. (Id; Tr. 632: 13-17).  AAH did not construct any modular

units at the Tennessee facility. (Tr. 654).

128.    On August 31, 2005, Kurth sent a memo to Lee regarding Tennessee's approval. (Tr. 660; Pl. Ex. 179). In the memo, Kurth stated that the letter of filing was all that was required in order to apply for a building permit with Pigeon Forge. (Id.).

129.    On September 8, 2005, Winforge applied for a building permit with the city of Pigeon Forge, Tennessee. (Tr. 174: 6-19; Pl. Ex. 181A).

**AAH Unilaterally Transfers Manufacturing from Tennessee to
North Carolina Because it no Longer Had Sufficient Employees To Complete the Work**

130.    After the State of Tennessee issued the Letter of Filing and Winforge applied for a building permit, Lee was notified that the location for manufacturing the modular units was being transferred from AAH's Tennessee facility to AAH of North Carolina. (Tr. 177 - 178).

131.    AAH transferred production from Tennessee to North Carolina because the Tennessee plant no longer had sufficient employees to complete the work. (Tr. 654). In fact, AAH had reduced the number of employees at the Tennessee facility from 110 to around 20 to 30. (Tr. 654). Following this reduction, AAH closed its Tennessee plant. (Tr. 660).

132.    In October, 2005, AAH resubmitted paperwork reflecting the transfer to North Carolina. (Tr. 656; Pl. Ex. 184A).

133.    The State of Tennessee received the plans reflecting the North Carolina location on October 10, 2005 and issued a new Letter of Filing that day. (Pl. Ex. 184A).

134.    Upon receipt of the Letter of Filing, AAH was permitted to begin construction of the modular units at its North Carolina plant. (Tr. 657). AAH did not construct any modular units at the North Carolina facility. (Tr. 657).

### Project Delays Force Repeated Extensions
### to the Loan Agreement and Franchise Agreement

135.    Based on MUK/AAH's  failure to meet their contractual obligations, Winforge
was forced to extend the term of the Loan Agreement on four separate occasions. (Tr. 345; Pl.
Ex. 91, 128, 159, 182).

136.    Based on MUK/AAH's failure to meet their contractual obligations, Winforge also
was forced to extend the term of the Franchise Agreement on three separate occasions.  (Tr. 345-
346, PL. Ex. 85A).

### Winforge Requests a Meeting with Coachmen

137.    On November 18,  2005, McMahon contacted Coachmen CEO Claire Skinner for
the purpose of scheduling a meeting to resolve issues and permit the Project to move forward.
(Tr. 346, Pl. Ex. 187). Skinner responded and indicated that she would be happy to schedule the
meeting. (Tr. 347; Pl. Ex. 187).

138.    On November 21, 2005 McMahon and Lee met with Kerr, Samovitz, Kurth and
Schafer at Coachmen's headquarters. (Tr. 348). Skinner did not attend. (Tr. 347-348).

139.    The meeting began with a hostile tone, including raised voices and accusations.
(Tr. 349).

140.    At the meeting, Schafer conceded that Winforge's contractual obligations did not
begin until MUK/AAH met their obligation to provide drawings approved by the franchiser,
third-party, state and local authorities. (Tr. 350).

141.    During the meeting, McMahon urged AAH to provide a date on which
construction at the factory would begin. (Tr. 353-354). McMahon explained that he was under

pressure from Wingate to provide this information and open the hotel. (Tr. 354).

142.    At the end of the meeting, Samovitz provided a general release agreement to McMahon, releasing Coachmen from liability arising from the Project and asked him to sign it. (Tr. 355; Pl. Ex.191).  McMahon did not sign the release. (Id.).

### Pigeon Forge Denies Winforge's Application for a Building Permit

143.    On February 13, 2006, the City of Pigeon Forge denied Winforge's application for a building permit. (Pl. Ex. 207). The letter denying the application was sent by Earlene Teaster, the City Manager for Pigeon Forge. (Id.) In the letter, Teaster outlined the basis for the denial:

> In June of 2004, a site plan for a Wingate Inn was submitted to the city's planning commission for review....On August 3, 2004, the site plan was formally approved by the planning commission. More than 18 months have now passed, during which time our staff has had to deal with several issues, including the lack of stamped engineering drawings, proper inspection certificates for the proposed modular units, and the necessity for the contractor to be licensed in the state of Tennessee. [A] significant amount of new development has occurred in Pigeon Forge. Much of this new construction is located in the general vicinity of the proposed Wingate Inn, which has stressed the sewage collection infrastructure in this part of town. **While the sewer system could have accommodated this project in 2004 that is not the case at the current time..[W]e cannot put ourselves in the position of issuing a building permit for a project that may not be able to connect to the sewer system at the time the hotel would be completed.** (Id.).

### Coachmen Initiates Foreclosure Proceedings and Litigation Ensues

144.    On February 23, 2006, Coachmen notified Winforge that Winforge was in default of the Loan Agreement. (Pl. Ex. 208).

145.    On March 24, 2006, Coachmen notified Winforge that Coachmen intended to institute foreclosure proceedings. (Pl. Ex. 210).

146.    On April 17, 2006, this litigation ensued.

**Conclusions of Law**

**The Court Should Find that MUK/AAH Breached the Development Agreement**

147.    Under Virginia law, interpretation of a contract is a question of law. *PMA Capital Ins. Co. v. U.S. Airways, Inc.*, 626 S.E.2d 369, 372 (Va. 2006). In the absence of an ambiguity, a court must interpret the contract by examining the language explicitly contained therein. *School Bd. of City of Newport News v. Commonwealth of Virginia*, 689 S.E.2d 731, 735 (Va. 2010). In a breach of contract claim, the parties' contract becomes the law governing the case unless it is repugnant to some rule of law or public policy. *Winn v. Aleda Const. Co. Inc.*, 315 S.E.2d 193, 194 (Va., 1984) "The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *Palmer & Palmer Co., LLC v. Waterfront Marine Const., Inc.*, 662 S.E.2d 77 (Va., 2008)(*quoting  W.F. Magann Corp. v. Virginia-Carolina Elec. Works, Inc.*, 123 S.E.2d 377, 381 (1962)).

148.    Winforge contends that the Development Agreement is clear. Nonetheless, even if the Court determines the Development Agreement is ambiguous, the result is the same.

149.    Pursuant to the Development Agreement, MUK was obligated to: (a) prepare all plans necessary to complete the hotel building; (b) receive franchiser, third-party, state and local approvals; and (c)  manufacture and deliver modular units to Winforge. MUK was obligated to perform its contractual obligations on or before December 31, 2004.

150.    MUK and AAH failed to perform their obligations under the Development Agreement. In particular, the Court finds that MUK/AAH did not complete any of its contractual obligations on or before December 31, 2004. The plans prepared by MUK/AAH were approved

30

by Wingate, TRA and the State of Tennessee in August, 2005. The plans were never approved by

Pigeon Forge.  Moreover, MUK/AAH never built or delivered one single unit.

151.    In the Court's Order on the parties' Cross Motions for Summary Judgment, the

Court ruled in favor of Winforge on its claim that Coachmen was liable to Winforge under the

direct participant theory of liability. In the Court's entry following the January 25, 2010 pre-trial

conference in this matter, the Court stated that "[I]f Mod-U-Kraf is found to have breached the

Development Agreement, Coachmen will also be liable." (Entry for January 25, 2010, DE 149, p.

2.). As such, Coachmen is also liable for breach of the Development Agreement.

**The Court Should Find That Winforge is Entitled to
A Judgment in Favor Winforge and Against The Defendants**

152.    In the Court's Order on the parties' Cross Motions for Summary Judgment, the

Court delineated the scope of damages recoverable in this matter:

> We hold that the loss of Winforge's initial investment in the real estate would be a
> natural and foreseeable consequence of a breach by Mod-U-Kraf, as would
> reasonable fees and expenses incurred by Winforge during development. In
> addition, increased interest costs due to an extended loan term during construction
> delays are considered direct damages. (Order, August 27, 2008, p. 26-27).

**Winforge's Initial Investment in the Real Estate**

153.    The parties stipulated that, on January 28th, 2003, the fair market value of the

property was $1.36 million. (Pl. Ex. 252).

154.    During trial, the Court took judicial notice that, on November 15, 2006,

Coachmen bid $1.8 million for the property at the Sheriff sale conducted subsequent to the

foreclosure. (Tr. 360). As such, the fair market value of the property appreciated at the rate of

$9,670.00 per month.[20]

155.    Accordingly, based upon the rate of appreciation, at the time the contract was breached on December 31, 2004, the fair market value of the property was $1,582,410.[21]

156.    At the time that Coachmen and Winforge entered the Loan Agreement, there was debt on the property of $367,257.85, which Winforge is not entitled to recover. (Pl. Ex. 233).

157.    Accordingly, Winforge should recover $1,215,152.15 for its initial investment in the real estate.

### Winforge's Development Fees and Expenses

158.    Pursuant to the Loan Agreement, Coachmen loaned Winforge $2,326,692.

159.    All of the money received from Coachmen pursuant to the Loan Agreement was utilized on the development of the Project. (Tr. 300 - 302; Tr. 362).

160.    In particular, Lee confirmed that the development expenses included the initial closing costs and loan payoff of approximately $600,000, expenditures for furniture, fixtures and equipment of approximately $625,000, development fees of $250,000, and approximately $500,000 in overhead expenses. The balance of the loan amount was spent on payments made to various third-party suppliers. (Id.).

161.    On August 27, 2008, the Court entered judgment in favor of Coachmen and against Winforge and McMahon in the amount of $721,339.95 on Coachmen's claim under the

---

[20]    The monthly appreciation is derived from the increase in value between February 2003 and November 15, 2006 of $440,000 divided by the 45.5, the number of months between the two dates.

[21]    This rate of appreciation occurred over 23 months, from the end of January, 2003 through the breach on December 31, 2004. Accordingly, the property appreciated by $222,410. This amount, added to the property's value on January 28, 2003, is $1,582,410.

Loan Agreement.

162.    Because all of the loan proceeds were utilized in furtherance of the Project, and because the Defendants breached the Development Agreement, the judgment against Winforge and McMahon should be extinguished.

163.    Accordingly, Winforge respectfully requests the Court to: (a) enter judgment in favor of Winforge and against MUK, AAH and Coachmen in the amount of 1,215,152.15, plus prejudgment interest; and (b) extinguish the judgment previously entered against the Plaintiffs.

SOPKO, NUSSBUAM, INABNIT & KACZMAREK

By: s/Kevin E. Warren
Brent E. Inabnit, #17387-71
Kevin E. Warren, #26638-64
5th Floor - Plaza Building
210 South Michigan Street
Post Office Box 300
South Bend, Indiana 46624
Telephone: (574) 234-3000
Facsimile: (574) 234-4220
Attorney for Plaintiffs

33

**CERTIFICATE OF SERVICE**

Notice is hereby given of electronic filing of the foregoing Motion on this 2nd day of April, 2009, via the Court's website and electronic filing system. Contemporaneously with the filing of this Proof of Service, a copy has been served via the Court's electronic filing system to counsel of record as follows:

Richard C. Richmond, III
rrichmond@taftlaw.com

Georgianne Marie Walker
gwalker@maylorber.com

W. Todd Woelfer
wwoelfer@maylorber.com

s/ Kevin E. Warren

34