IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WINFORGE, INC. and BYRON McMAHON    )
                                     )
v.                                        )        CASE NO. 1:06-CV-0619-SEB-JMS
                                     )
COACHMEN INDUSTRIES, INC., ALL      )
AMERICAN HOMES, LLC  and MOD-U-KRAF   )
HOMES, LLC                           )

**PLAINTIFFS' POST-TRIAL REPLY BRIEF**

## I.    Introduction.

Having heard the overwhelming evidence regarding Mod-U-Kraf's ("MUK") failure to perform its contractual obligations as set forth in the Development Agreement, Defendants now assert a plethora of legal defenses which are contrary to: (a) Defendants' pleadings filed in this case; (b) the Court's August 27, 2008 Order on Cross-Motions for Summary Judgment; (c) the express provisions of the Development Agreement; (d) the evidence adduced at trial; and (e) Virginia law. Accordingly, Winforge respectfully requests the Court to enter judgment in its favor and against Defendants on Count VII of Plaintiffs' Complaint.

## II.    The Court Should Not Consider Statements That Are Either Unsupported By The Record, Contrary To The Record, Or Not Material To The Issues Before The Court.

In their Brief, Defendants make numerous factual statements that are either unsupported by the record, contrary to the record, or not material to the issues before the Court.[1] Plaintiffs have not addressed each and every statement that falls into the above three categories. Instead, Plaintiffs address only those statements which are material to the issues before the Court.

---

[1]    Plaintiffs further note that several of the statements are made with no citation to the record at all.

### A.    Project Engineer.

Defendants contend that Winforge was responsible for hiring a Project Engineer who was, in turn, responsible for designing the entire Project. (Defs.' Brief, p. 4). In support, Defendants rely upon the definition section of the Development Agreement. *(Id.)*. Throughout their Brief, Defendants resort to the defined term in an attempt to blame Winforge for MUK's failures.

Engineer is a defined term in the Development Agreement which "means the licensed Engineer retained by Winforge to perform the design services for the Project, as approved by Lender." (Plfs.' Ex. 29, ¶ 2.6). Other than being referred to in the definition section, the defined term does not appear on one single page of the Development Agreement or the exhibits attached thereto.[2] If Winforge was obligated to design the entire Project, this obligation would have been stated in Section 4 of the Development Agreement. Whether the obligation exists or not, it has no relationship to MUK's obligation to prepare the architectural drawings. Indeed, there is no reference to "Engineer" in paragraphs 1.2, 1.3, 1.4 and/or 10.4 of the Scope of Work. The fact is that MUK retained an engineer to assist with the preparation and submission of architectural drawings to various entities. (Plfs.' Brief, ¶¶ 116-118). Unfortunately, the engineer experienced multiple problems which delayed the submittal process. *(Id.)*. Winforge acknowledges that it was obligated to hire engineers to perform work related to the areas outside of the building and that is exactly what Winforge did. (Plfs.' Brief, ¶ 76).

### B.    Scope of Work.

Defendants assert that the Scope of Work was in "constant flux and never finalized." (Defs.' Brief, p. 3, fn. 5). The Scope of Work was not in constant flux. After negotiations that produced

---

[2]    The most logical explanation for the inclusion of the defined term "Engineer" is that it was simply an oversight by Kathy Samovitz ("Samovitz") when she drafted the Development Agreement in a short period of time utilizing an existing Coachman form that had no application to this particular project.

2

ten separate revisions, the Scope of Work was finalized, agreed upon and signed by both MUK and Winforge. (Plfs.' Brief, ¶¶ 39-49, 61). The only Scopes of Work that were in flux were the two that were prepared after the Development Agreement was signed. (*Id.*, ¶¶ 83 - 86). Both of these were prepared without input from Winforge, included revisions that went far beyond the discussions between the parties and were provided without the revised cost information. (*Id.*).

### C.     General Contractor.

Defendants assert that Winforge was required to retain a General Contractor and that its failure to do so caused multiple delays in the submittal process. (Defs.' Brief, pp. 4-5, 12-13). Winforge acknowledges that it was obligated to retain a General Contractor. However, as Samovitz conceded on cross-examination, Winforge's obligation did not arise until MUK prepared the architectural drawings and had them approved. (Tr. 714-718; Plfs.' Exs. 16, 29). Samovitz confirmed that Mike Lee ("Lee") repeatedly informed her that he needed the plans before he could hire a General Contractor. (Tr. 720). Byron McMahon ("McMahon") also testified that the need to hire a General Contractor did not arise until the plans were complete and construction of the modular units was scheduled to commence. (Tr. 377, 382-383).

### D.     Deficiencies Identified In Defendants' Architectural Drawings.

Faced with the overwhelming number of deficiencies in their architectural drawings, Defendants are left with no alternative but to blame Winforge for their shortcomings. Defendants assert that Winforge assumed obligations related to the mechanical, electrical, plumbing, fire alarm, and sprinkler plans, the packaged thermal air conditioners (PTACs), the roof, insulation and "Won" door. (Defs.' Brief, pp. 6, 7, 8-9, 14, 16-17, 28, 30).

While Winforge agreed to assist MUK in obtaining sprinkler drawings, and in fact provided the drawings on June 23, 2004, Winforge never assumed the obligation to design the sprinkler system

3

and/or any of the systems identified above.  (Tr. 134-136, 215-217, 261-262, 285; Plfs.' Ex. 54).

Moreover, Winforge never assumed the obligation to have the systems approved by any entity.

Further evidence is found in the two revised Scopes of Work sent by Defendants to Winforge.  In

these proposed revisions, Defendants attempt to shift several of these obligations to Winforge.  The

revised Scopes of Work were never signed by Winforge.  (Plfs.' Brief, ¶¶ 83-86).

        The Scope of Work made clear that MUK was obligated to prepare "**all** architectural

drawings" and even specifically identified the mechanical, electrical and fire sprinkler plans.  (Plfs.'

Ex. 29, Ex. A ¶¶ 1.3, 10.4).  (Emphasis added).  The Development Agreement further made clear that

changes to the Scope of Work were required to be made pursuant to a written change order.  (Plfs.'

Ex. 29, ¶ 14.1).  No written change order was ever executed.  Defendants' argument that Winforge

assumed MUK's obligations is also contrary to Virginia law.  Plaintiffs have set forth the pertinent

law and analysis in Section VII of this Brief.

**III.    The Court Should Determine That The Development Agreement Is A Valid, Binding
          and Enforceable Contract.**

        Defendants contend for the first time that the Development Agreement between MUK and

Winforge is not a valid, binding and enforceable contract.  (Defs.' Brief, pp. 22-23).[3]  In support,

Defendants assert that the Development Agreement lacked two (2) essential terms.  (*Id.*).  First,

---

        [3]      Defendants have already conceded that the Development Agreement is a valid, binding and
enforceable contract.  On April 17, 2006, Plaintiffs filed their Complaint.  In paragraph 17, Plaintiffs alleged that
Winforge entered into the Development Agreement with MUK and attached the Development Agreement as Exhibit
6 to the Complaint.  (D.E. 1, ¶ 17).  On June 9, 2006, Defendants answered the Complaint and admitted the existence
of the Development Agreement.  (D.E. 29, ¶ 17).  Nowhere in their Answer and/or their Affirmative Defenses did
Defendants ever assert that the parties failed to enter into a valid, binding and enforceable contract.  Significantly, on
August 27, 2008, the Court entered an Order on the parties' Cross-Motions for Summary Judgment and found that the
parties entered into the Development Agreement.  (Order, D.E. 93, 8/27/08, pp. 3-4).  Finally, at trial, Jeff Powell
("Powell"), who signed the Development Agreement on behalf of MUK, testified at length regarding the negotiation
and execution of the Development Agreement and the parties' obligations pursuant to the Development Agreement.
(Tr. 512, 522-526, 530-536).  Powell never testified, or even suggested, that the Development Agreement was not a
valid, binding and enforceable contract.

Defendants claim that the Scope of Work was not clearly defined because of the word "preliminary" reflected on the title page of the Scope of Work. (*Id.*). Second, Defendants claim that the parties did not agree on the "price" Winforge would pay MUK. (*Id.*). Defendants' position is contradicted by the terms of the Development Agreement, the testimony of the parties and the conduct of the parties after the Development Agreement was executed.

Defendants' reliance on the single word, "preliminary," contained as a heading in the Scope of Work, is meaningless. (*Id.*, p. 23). Section 26.6 of the Development Agreement provides that the titles used in the Development Agreement are for ease of reference and shall not be relied upon for any other purpose. (Plfs.' Ex. 29, ¶ 26.6).

Defendants' argument regarding "price" fares no better. Defendants' argument ignores the existence of Exhibit C to the Development Agreement. (Plfs.' Ex. 29, Ex. C). Exhibit C, labeled Contract Price, provides a comprehensive, itemized breakdown of costs for all aspects of the project, including, among others, the modular units, transportation, installation of furniture, the sprinkler system, roof membrane and HVAC system. (*Id.*).

The Scope of Work, including Exhibit C, was negotiated for at least 10 months and was subject to 10 revisions. (Tr. 511-514; Plfs.' Exs. 7; 11; 13; 14; 15A; 24A; 25A; 29). The Scope of Work clearly spelled out the responsibilities of the parties with respect to all aspects of the project, including, among others, its design, approval, delivery, construction and price. (Plfs.' Ex. 29, Ex. A). The Development Agreement and Scope of Work were each separately signed on behalf of Winforge and MUK. (*Id.*). The parties agreed to all necessary terms and, if changes were contemplated, further agreed to a specific process for amending the Development Agreement. Section 14.1 of the Development Agreement clearly states the parties' understanding that all changes to the Development Agreement or its exhibits were to be made pursuant to a written change order. (Plfs.' Ex. 29, ¶ 14.1).

5

The validity of the Development Agreement is further evidenced by the conduct of the parties subsequent to its execution. Significantly, over the course of 20 months, Coachmen Industries loaned $2.3 million to Winforge. One of the conditions precedent to the Loan Agreement was the execution of the Development Agreement. (Plfs.' Ex. 30, ¶ 5.2(e)). Moreover, after signing the Development Agreement, the parties performed various activities in an attempt to comply with their respective obligations as set forth in the Development Agreement.

Based upon the terms of the Development Agreement, the testimony of the parties and the conduct of the parties after the Development Agreement was executed, the Court should determine that the Development Agreement is a valid, binding and enforceable contract.

**IV.    The Court Should Determine That The Development Agreement Required MUK To Provide All Architectural Drawings Needed In Order To Obtain Approval From The Franchiser, Third Party, State And Local Authorities, As Well As Construct And Deliver The Modular Units.**

Defendants contend that their design and approval obligations did not include "all architectural drawings," but were solely limited to "modules." (Defs.' Brief, p. 26). Defendants' limitation argument is contradicted by the express language of the Development Agreement and the conduct of the parties after the Development Agreement was executed.[4]

---

[4]    Throughout their brief, Defendants attempt to limit MUK's obligations and even suggest that the Development Agreement is ambiguous and that resorting to parol evidence favors a narrowed interpretation. (Defs.' Brief, pp. 22, 24-27). First, the Development Agreement is not ambiguous. It is clear and does not include any of the limitations that Defendants have advanced. Second, to the extent that the Court believes the Development Agreement is ambiguous on MUK's design and approval obligations, the Court should not consider the parol evidence of David Kurth ("Kurth"). Kurth was not involved in any of the negotiations of the Development Agreement. As such, he has no parol evidence to offer. *Jim Carpenter Company v. Potts*, 495 S.E.2d 828, 833 (Va., 1998) (Noting that parol evidence, when admissible, regards "facts **contemporaneously agreed upon**" regarding the contract in question.) (Emphasis added). Defendants urge the Court to consider Powell's parol evidence without any citation to the record. According to the Defendants, "MUK was, for all intents and purposes, a supplier." (Defs.' Brief, p. 27). Virginia law is no different than Indiana law in that parol evidence cannot be used to contradict the express provisions of a contract. *Jim Carpenter Company*, 495 S.E.2d at 832. ("The rule which excludes parol evidence when offered to vary the terms and conditions of an integrated written contract has nowhere been more strictly adhered to in its integrity than in Virginia."). In short, MUK was not simply a supplier and the Development Agreement clearly establishes that fact.

Winforge agrees that the Development Agreement must be read as whole in order to determine the parties' rights and obligations.  Winforge has not claimed that MUK was responsible for "designing the entire Project, obtaining approvals for the Project, and completing the Project by December 31, 2004."  (Defs.' Brief, p. 24).   Rather, Winforge contends that MUK's design and approval obligations were related to the building.  The design and approval of the drawings set forth in the Development Agreement involved two basic areas: (1) the building itself from the ground up; and (2) the area outside of the building.  (Tr. 93, 125-127; Plfs.' Exs. 15; 16; 29).   MUK was responsible for providing **all** architectural drawings needed in order to obtain approval from the franchiser, third-party, state and local authorities involving the building itself from the ground up. (Tr. 91).[5]  (Emphasis added.).  Winforge, on the other hand, was responsible for the design and approval of various plans related to improvements outside of the building.  (*Id.*).[6]

Defendants concede that they were responsible for the design of the modular units.  (Defs.' Brief, pp. 25-26).  As explained by Lee, the building itself consisted **only** of modular units.[7]  (Tr. 306 - 310).  (Emphasis added).  Therefore, MUK was responsible for the design of the inside of the

---

Defendants further attempt to limit their obligations by pointing to a series of sections in the Scope of Work that address Winforge's obligations once the modular units had been shipped.  (Defs.' Brief, p. 26).  Winforge acknowledges that it was responsible for overseeing the completion of modular unit tie-ins, referred to at trial as "stitching."  (Plfs.' Exs. 29, Ex. A, ¶¶ 1.4, 6, 7, 8, 9 and 10; Tr. 77).  However, these stitching obligations have nothing to do with a determination of who was responsible for the design and approval of the inside of the building from the ground up.  None of these sections in the Scope of Work make any reference to the creation of drawings by Winforge or Winforge's responsibility to gain approvals from any regulatory body.  (*Id.*).

[5]     During the course of the litigation, Defendants produced the documents admitted at trial as Plaintiffs' Exhibits 75A, 76D, 76E, and 77B.  Lee and McMahon testified that Winforge did not prepare these exhibits.  (Tr. 180-181, 362 -363).  The exhibits provide that Defendants were responsible for, among others, "Preliminary Floor Plans," "Working Drawings" and "State Submittal Drawings."  There is no reference to an obligation of Winforge to prepare drawings.  Accordingly, these exhibits are further evidence that MUK was obligated to design and obtain approvals for the entire building.

[6]     Consistent with these obligations, Winforge performed its contractual obligations.  (Plfs.' Brief, ¶¶ 75, 76).

[7]     This point was not contradicted at trial by any testimony that followed Lee.

building itself from the ground up.[8]  MUK's obligation  is clearly set forth in Sections 1.3, 4.1 and

10.4  of the Scope of Work, which provided:

> **Section 1.3**:
> MUK shall provide modular units and material noted on plans for installation and completion  of a Wingate Inn.  **This will include all architectural drawings, structural calculations for modular unit construction, mechanical, electrical systems for modulars, and sprinkler system.** (Pl. Ex. 29, Ex. A. ¶ 1.3). (Emphasis added).
>
> **Section 4.1:**
> MUK will **provide architectural drawings and foundation footprint, and receive all state, local and county approvals**. The General Contractor will be responsible for the engineering of the foundation.  (*Id.*, ¶ 4.1).  (Emphasis added).
>
> **Section 10.4**
> **MUK will provide subcontractor for design and installation of Sprinkler System**.  Subcontractor will install portion of sprinkler system in manufacturing facility and travel to job site for on-site connections, testing, and approval. Subcontractor will be responsible to tie in sprinkler system at 1' above first level floor. WINFORGE will be required to extend sprinkler connection to public water system. (*Id.*, ¶ 10.4).  (Emphasis added).

The Defendants were also obligated to acquire approval for the portions of the building  over

which they had design responsibility.  (Plfs.' Ex.  29, Ex. A, ¶ 1.2; Tr. 93, 125-127).  The Scope of

Work, Section 1.2, reflected the approval process:

> [MUK] shall manufacture units at the [MUK] manufacturing facilities in accordance with approved Specifications and Drawings.  **Drawings to meet local, state, 3rd party and franchiser requirements**.  (Pl. Ex.  29., Ex, A, ¶ 1.2).  (Emphasis added).[9]

---

[8]      Winforge acknowledges that its General Contractor was responsible for the engineering of the foundation. (Plfs.' Ex. 29, Ex. A, ¶ 4.1).  As set forth above, the obligation to retain the General Contractor did not arise until MUK prepared and received approval for all of the architectural drawings, including the "foundation footprint" in accordance with Sections 1.2, 1.3 and 4.1 of the Scope of Work.

[9]      The Court, in addressing these very arguments in its Order on the parties' Cross-Motions for Summary Judgment, reached the same conclusion:

> The Scope of Work document attached to the Agreement is somewhat more informative; it requires Mod-U-Kraf to 'provide architectural drawings and foundation footprint, receive all state, local and county approvals.' Scope of Work ¶ 4.1.  Another clause requires Mod-U-Kraf to 'provide modular units and material noted on plans for installation and completion of a Wingate Inn. *This will include*

Accordingly, MUK was first required to obtain approval for the architectural drawings from the hotel franchiser, Cendant.  (*Id.*; Tr. 125 - 126, 515-516).  MUK was next obligated to get approval from the third party, TRA, followed by the State of Tennessee, and, finally, Pigeon Forge, the local municipality.  (*Id.*, Plfs.' Ex. 29, Ex. A, ¶ 1.2).  Upon conclusion of the design and approval process, MUK was required to construct and deliver the modular units.  (Plfs.' Ex. 29, Ex. A, ¶¶ 1.3, 1.2).  MUK was obligated to complete all of its contractual obligations on or before December 31, 2004. (Plfs.' Ex. 29, Ex. D).

Further evidence that MUK was required to design and obtain various approvals for the inside of the building from the ground up is the fact that all of the drawings admitted into evidence at trial are drawings of the "entire building."  (Plfs.' Exs. 229; 229a; 229b).  Furthermore, all of the submissions made by MUK and its successor to the four entities seeking approval involved the "entire building."  (Plfs.' Exs. 20A; 24C; 45; 76A; 227; 228).

Based upon the clear express language of the Development Agreement and the subsequent conduct of MUK, the Court should determine that the Development Agreement required MUK to provide **all** architectural drawings needed in order to obtain approval from the franchiser, third party, state and local authorities.  (Emphasis added).  The Court should also determine that the

---

*all architectural drawings*[.]' Id. ¶ 1.2. Upon our reading, these unqualified clauses appear to create the obligations in question; it is difficult to square these seemingly plain statements with Mod-U-Kraf's insistence that it was only required to complete such tasks as to the modular units.  We question the genuineness of Mod-U-Kraf's protestations particularly because its representatives repeatedly badgered Winforge for information so that it could obtain necessary approvals and permits for the *entire structure*.  (Order, D.E. 93, 8/27/08, p. 24.)  (Emphasis in original.)

Development Agreement obligated MUK to construct and deliver the modular units on or before December, 31, 2004.[10]

## V.    The Court Should Determine That MUK Breached The Development Agreement.

The evidence regarding the approval process is largely undisputed.  Cendant approved MUK's drawings prior to June, 2004.  (Plfs.' Brief, ¶ 93, fn. 18).  The third-party, TRA, finally approved MUK's drawings on August 29, 2005.  (*Id.*, ¶ 126).  The State of Tennessee approved the drawings and issued its Letter of Filing on August 30, 2005.  (*Id.*, ¶ 127).

There is no evidence which establishes that Pigeon Forge approved the drawings.  This issue first arose during Kurth's direct examination:

Q.    Did the City of Pigeon Forge approve this project, the modular construction?

A.    The evidence of that would have been the issuance of a building permit, and the answer to that is no.
(Tr. 637)

The Defendants subsequently attempted to elicit hearsay testimony on this point:

Q.    Are you aware from the TPA who was involved in this case whether or not Pigeon Forge approved this project?

A.    I was informed by the TPA that in a direct conversation –

MR. INABNIT: Objection, hearsay.

THE COURT: Sustained.
(*Id.*).

On re-cross examination, Kurth again addressed the issue:

---

[10]    Defendants contend that there is no basis to conclude MUK was obligated to perform its contractual obligations on or before December 31, 2004.  (Defs.' Brief, p. 30, fn. 32).  The date is established by Exhibit D to the Development Agreement.  (Plfs.' Ex. 19, Ex. D).  Exhibit D sets forth the agreed upon schedule of work.  (*Id.*).  The specific month and date were not filled in, however, the year, 2004, was.  Using the last available date, Winforge established December 31, 2004 as the date that MUK was obligated to performs its contractual obligations.  Moreover, this timing for the completion of MUK's obligations is consistent with the testimony of McMahon and Lee.  (Tr. 128, 339-340).

Q.     The first time I heard Mr. Woelfer ask you whether or not Pigeon Forge approved the modular portion of the drawings, I heard you say no because the building permit was not issued.  Did I hear you right?

A.     You didn't hear his question correctly.  He asked me if Pigeon Forge approved the project, and I said "no" evidenced by the fact that the building permit was never issued.

Q.     All right.  What I want to know then specifically is, and we have all of these exhibits, they probably total 400, have you ever seen a piece of paper from Pigeon Forge approving the plans?

A.     Not a piece of paper, no.
       (Tr. 664).

The testimony of Ray Helmer ("Helmer"), who reviewed the plans on behalf of TRA, also provided no evidence that Pigeon Forge had approved the project.  In the course of describing an email that Helmer had sent to Kurth, Helmer testified that Pigeon Forge had accepted the plans. Helmer was unable to state whether that information had come from a representative of Pigeon Forge.  (Tr. 765).  Significantly, the email and Helmer's testimony about this email cannot be considered to prove the truth of the matter asserted therein - - that Pigeon Forge had in fact approved the plans.  (Tr. 765) (In response to a hearsay objection, the Court stated "Well, if that's what he told Kerr and Kurth, it comes in that way because it's not offered for the truth of the matter."). Defendants failed to establish that Pigeon Forge approved the plans.[11]  The only evidence from Pigeon Forge is dated February 13, 2006, when Pigeon Forge denied the application for a building permit. (Plfs.' Brief, ¶ 143).

Accordingly, the evidence clearly established that by the end of December, 2004, Defendants had not received an effective approval from TRA, and had received no approval from the State of

---

[11]     Evidence that Defendants anticipated that they would be unable to obtain approval from Pigeon Forge is provided by the two proposed revisions to the Scopes of Work that Defendants sent to Winforge in July and September, 2004.  (Plfs.' Brief, ¶¶ 83-86).  In each of the proposed revisions, Defendants attempted to shift the obligation to obtain local approval from Defendants to Winforge.

11

Tennessee.  Though these approvals were belatedly achieved in August, 2005, there is no evidence that Pigeon Forge ever approved the plans.  Finally, it is undisputed that Defendants never built and/or delivered a single modular unit.

## VI.   The Court Should Determine That MUK Is Not Entitled To An Equitable Extension Of Time.

Defendants contend that MUK is entitled to an equitable extension of time because: (a) Winforge did not perform its contractual obligations; (b) Winforge prevented MUK from performing its contractual obligations; (c) Winforge failed to pay money to MUK; and (d) Winforge failed to hire a General Contractor and Project Engineer.  (Defs.' Brief, pp. 28-29).  In support, Defendants rely upon Section 12.1 of the Development Agreement.  (*Id.*).

First, as set forth in Plaintiffs' Post-Trial Brief and this Reply Brief, Winforge was not contractually obligated to perform the design work needed in order for MUK to obtain approval from the franchiser, third party, state and local authorities for the building from the ground up.  Moreover, Winforge did not do anything to prevent MUK from performing its obligation to complete the architectural drawings.  The record is replete with instances wherein Winforge tried to assist MUK during the various submissions.  Further, as noted above, the hiring of a General Contractor was not required until the architectural drawings were completed and approved.  (Tr. 714-718; Plfs.' Exs. 16, 29).  The hiring of a "Project Engineer" has nothing to do with MUK's obligation to get its drawings approved.  Finally, MUK makes no effort to explain how the failure to pay a deposit delayed MUK's ability to perform its obligation to prepare architectural drawings and have them approved.

Significantly, if MUK believed that it was entitled to an equitable extension of time, then it should have made a written request for such an extension.  Section 14.1.2 of the Development Agreement provided such a mechanism:

> MUK may request . . . changes in the Work or the timing or sequencing of the Work that impacts the Contract Price or Contract Time.  **All such changes in the Work that affect Contract Time or Contract Price shall be formalized in a Change Order.**  Any such requests for a change in the Contract Price and/or Time shall be processed in accordance with this Agreement. (Plfs. Ex. 29, ¶ 14.1.2). (Emphasis added).

The Development Agreement further noted:

> Winforge and . . . MUK shall negotiate in good faith an appropriate adjustment to the Contract Price and/or the Contract Time and shall conclude these negotiations as expeditiously as possible.  Acceptance of the Change Order and any adjustment in the Contract Price and/or Contract Time shall not be unreasonably withheld. (*Id.*, ¶ 14.1.3).

MUK never made such a request because no basis existed for an equitable extension of time.  (See also Section 15 – Claims For Additional Costs Or Time.).  As such, the Court should determine that MUK is not entitled to an equitable extension of time.

## VII.   The Court Should Determine that Winforge Did Not Breach the Development Agreement.

Defendants contend that Winforge committed a prior breach of the Development Agreement by: (a) failing to pay a 10% deposit; (b) failing to hire a General Contractor and Project Engineer; (c) failing to obtain a building permit, and (d) failing to complete obligations for which it had assumed responsibility.  (Defs.' Brief, pp. 29-30).  Defendants are simply wrong.[12]

First, the obligation to pay a deposit did not arise until the drawings had been approved.  Once the approval process was complete, the Development Agreement required the General Contractor

---

[12]      Winforge has already addressed the issues involving the General Contractor and Professional Engineer.  No further argument is necessary.

to complete an acknowledgment of the plans and order production of the modular units.  (Tr. 714-718; Plfs.' Ex. 29).  Once the order was placed, Winforge was obligated to pay a 10% deposit to MUK.[13]

Second, Winforge agrees that it was obligated to obtain a building permit.  On August 31, 2005, Kurth wrote a memo to Lee enclosing the drawings, calculations and specifications that had been approved by the State of Tennessee.  (Plfs.' Ex. 179).  Kurth wrote:

> [t]hese sets of drawings, specifications and calculations, along with a copy of the "letter of filing" should be all that you need to submit to the Building Codes Review and Enforcement Agency of Pigeon Forge and Sevier County Board of Health, relative to the modular building, for issuance of the building permit.  (*Id.*).

On September 8, 2005, Winforge applied for a building permit.  (Plfs.' Ex. 181A).  On February 13, 2006, Pigeon Forge denied the application for a building permit.  (Plfs.' Brief, ¶ 143).  Defendants have failed to explain how Winforge breached the Development Agreement.  Nor is there any analysis regarding how this purported breach in September, 2005 preceded MUK's breach in December, 2004.

Finally, Defendants restate their argument that Winforge assumed various responsibilities, and assert that Winforge's delay in completing these items constitutes a prior breach of the Development Agreement.  (Defs.' Brief, p. 30).[14]

Defendants' argument that the Development Agreement was modified by the parties' course of performance is also unavailing.  In support, Defendants rely on *Cardinal Development Company v. Stanley Construction Company, Inc.*, 497 S.E.2d 847 (VA., 1998).  *Cardinal* involved a contract for the construction of infrastructure improvements.  *(Id.* at 849).  After the contractor had bid on the completion of a development consisting of 42 building lots, the plans were altered to include 62

---

[13]     Despite Defendants' argument, there is no requirement that Winforge pay a 10% deposit to MUK upon execution of the Development Agreement.

[14]     Winforge has already addressed these issues from a factual standpoint.  Simply put, Winforge did not agree to assume MUK's obligations.

14

lots.  (*Id.*).  The contractor and developer met, discussed the changes, and verbally agreed to the modification.  (*Id.* at 850).  After performing some of the work, the contractor sent bills to the developer indicating "extra work" performed.  (*Id.*).  The developer paid some of the bills, but thereafter refused to pay for the additional work performed by the contractor.  (*Id.* at 849).  Based upon the parties' conduct, the court concluded that the parties' mutual intent to modify the contract had been shown by "clear, unequivocal and convincing evidence."  (*Id.* at 851).

        *Cardinal* is distinguishable in several respects.  First, in *Cardinal,* the parties' agreement did not require written change orders.  As such, the verbal agreement and conduct of both parties demonstrated the mutual intent to enter a new contract.  (*Id.*).  Second, the parties performed in accordance with their verbal agreement.  The contractor actually sent invoices based upon the new contract and the developer paid some of the invoices.  (*Id.*).

        The facts in this case are remarkably different.  First, the Development Agreement required that any modification to the Scope of Work be formalized pursuant to a written change order.  Second, MUK and Winforge never verbally agreed to modify their respective obligations pursuant to the Development Agreement.  The Defendants' argument lacks reference to any evidence that the parties had reached a meeting of the minds on these assumed duties.  In fact, Lee testified that he was unwilling to agree to any modification of the Development Agreement until the Defendants provided him with red-lined version of the proposed changes and revised pricing.  (Tr. 272).  When Lee was provided with the Defendants' proposed changes, these changes went far beyond any discussions that the parties had held.  (Plfs. Brief, ¶¶ 83-86).  In addition, as *Cardinal* makes clear, the burden of proof required to prove a mutual intention to modify the contract is "clear, unequivocal and

convincing evidence." *Cardinal,* 497 S.E.2d at 851.  Defendants have failed to acknowledge, let alone meet this burden of proof.[15]

Based upon the foregoing, the Court should determine that Winforge did not commit a prior breach of the Development Agreement.[16]

## VIII.   The Court Should Determine That Winforge Is Entitled To Recover Its Initial Loss Of Investment In The Real Estate And Its Reasonable Development Fees And Expenses.

### A.   Winforge Established That It Is Entitled To Recover $1,215,152.15 For Its Loss Of Its Initial Investment In The Real Estate.

Defendants contend that Winforge has failed to establish evidence of damages.  (Defs.' Brief, pp. 31-34).  In support, Defendants claim that Winforge had no initial investment in the real estate. (*Id.*, p. 31).  Defendants' argument is contrary to the Court's prior ruling that Winforge was entitled to recover its initial investment in the real estate.  In the Order, the Court specifically referred to Winforge's loss of the real estate's value.  (Order, D.E. 93, 8/27/08, p. 26).  At trial, Winforge established that it acquired the real estate from Mr. Thomas in exchange for providing Mr. Thomas with a 20% ownership interest in Winforge.  (Plfs.' Ex. 233; Tr. 338-339).  Accordingly, the real estate became a Winforge asset.  As a result of Defendants' breach of the Development Agreement, Winforge lost this asset.  On December 31, 2004, the real estate was valued at $1,215,152.  (Plfs.' Brief, ¶¶ 153-157).

---

[15]    Defendants also rely on *Reid v. Boyle*, 527 S.E.2d 137 (Va., 2000) for the proposition that a written agreement may be modified by a new oral contract even if the original agreement required modifications in writing. (*Id.* at 145).  Defendants' reliance on *Reid* is misplaced.  First, *Reid* did not involve a contract that included an express requirement that modifications were required in writing. To the extent the decision includes a reference to this proposition it is dicta.  Further, in concluding that a written contract had been modified, the court in *Reid* listed a series of facts that are not implicated in this case.  The court in *Reid* stated that the parties had ignored their written contract, never followed the contract's requirements, and in fact had lost and could not identify the contract that governed the parties' relationship.  (*Id.*).  No comparable circumstances are present in this case.  (*Id.*).

[16]    Plaintiffs also note that Defendants did not assert a breach of the Development Agreement in their responsive pleading.

16

Defendants also contend that Winforge has not provided evidence of the real estate's value at the time of the breach. (Defs.' Brief, p. 32). In support, Defendants rely on *Little v. Cooke*, 652 S.E.2d 129 (Va. 2007). *Little*, however, is factually distinguishable in one critical manner. In *Little*, plaintiffs had presented appraisals of the property's value at two points in time, January 30, 2003 and June 30, 2005, a date shortly before the trial in that matter. *Little*, 652 S.E.2d at 143. Both appraisals were conducted after the date of the breach, October 16, 2002. (*Id.*). Accordingly, the court concluded evidence had not been presented regarding the value at the time of the breach. (*Id.*).

In this case, Winforge presented evidence of the real estate's value **before** the breach of the Development Agreement. The parties stipulated that on January 28, 2003, the fair market value of the real estate was $1.36 million. (Plfs.' Ex. 252). In addition, Winforge presented evidence of the real estate's appreciation. (Plfs. Brief, ¶¶ 153-157). Accordingly, Winforge has shown that as of December 31, 2004, the real estate was valued at $1,582,410. (*Id.*). The Court took judicial notice of the fact that on November 15, 2006, Coachmen bid $1.8 million for the real estate at the Sheriff sale conducted subsequent to Coachmen's foreclosure of the property. (Tr. 360).[17] As a result, Winforge has presented sufficient evidence for the Court to conclude Winforge's loss of its initial investment in the real estate is $1,215,152.15.

## B.   Winforge Established That it Used All of the Loan Proceeds for the Development of this Project.

Defendants contend that Winforge failed to enumerate or otherwise establish its damages with reasonable certainty. (Defs.' Brief, p. 33). Defendants' argument fails to consider the testimony of Lee and McMahon, the exhibits introduced into evidence at trial, as well as the relevant Virginia law.

---

[17]   Defendants contend that the amount of the bid at the foreclosure sale is not evidence of value. (Defs.' Brief, p. 32, fn. 36). However, Virginia authority contradicts Defendants' position. *Barr v. MacGlothlin*, 11 S.E.2d 617, 620 (Va. 1940) ("If the resale is made within a reasonable time after the breach, the amount received is prima facie evidence of the saleable or market value at the time of the breach.").

First, damages need not be established with mathematical certainty. *Nichols Const. Corp. v. Virginia Machine Tool Co., LLC*, 661 S.E.2d 467, 472 (Va., 2008). Rather, a plaintiff is required only to furnish evidence of sufficient facts to permit the trier of fact to make an intelligent and probable estimate of the damages sustained." *Estate of Taylor v. Flair Property Assocs.*, 448 S.E.2d 413, 416 (1994). Accordingly, the determination of damages for a breach of contract will always be fact specific, and no single method exists for calculating the amount necessary to place the plaintiff in the position he would have occupied had the breach not occurred. *Nichols Const. Corp.*, 661 S.E.2d at 472; *see also Appalachian Power Co. v. John Stewart Walker, Inc.*, 201 S.E.2d 758, 767 (1974).[18]

Winforge met this burden. Lee testified with respect to the amounts spent in closing costs, in purchasing furniture, fixtures, and equipment, in development fees, various third-party suppliers as well as overhead for on-site staff. Lee testified that during the more than 20 months attempting to develop the project, the following amounts were expended in support of the development:

| | |
|---|---|
| Closing costs, including paying off the prior mortgage: | $600,000 |
| Furniture, Fixtures and Equipment: | $625,000 |
| Development Fee: | $250,000 |
| Overhead | $500,000 [19] |
| (Tr. 300-302, 362). | |

The remaining balance of the loan proceeds were utilized for payments to various third-party suppliers to the project. (Plfs.' Brief, ¶¶ 158-162). Together, these categories of expenses are reasonable and account for all of Winforge's lost development fees and expenses. (*Id.*). Lee testified

---

[18]     Defendants do not understand the concept of making Winforge whole. In short, before Winforge entered into the Development Agreement, Winforge owned the real estate and owed no money to Coachmen. In order to make Winforge whole, Winforge is entitled to recover the value of the real estate on the date of the breach and have all of the debt it owes to Coachmen extinguished.

[19]     The overhead amount was based upon 20 months of expenses associated with the payment of the site superintendent, the project manager, travel and office overhead. (Tr. 301-302).

that all of the funds received pursuant to the Loan Agreement were spent to develop the project.  (Tr. 302).  McMahon also testified that all of the funds received pursuant to the Loan Agreement were spent to develop the project.  (Tr. 360).  Moreover, the Defendants introduced into evidence an audit conducted on behalf of Coachmen.  (Defs'. Ex. S/14).  The audit concluded that budget overages were caused by delays in completing the project.  (*Id.*, Tr. 724-726).

Numerous draw statements and supporting documents were admitted into evidence that itemized the development expenses, including project manager fees, superintendent fees, office support, trailer and vehicle expenses.  (Plfs.' Exs. 237; 239; 240; 241; 242; 243; 245; 246; 247).  In short, there was no evidence that a single dollar had been expended on anything but the project.

### C.    Defendants Failed To Plead The Affirmative Defense of Failure To Mitigate Damages And, Nevertheless,  Have Failed To Support The Affirmative Defense.

Defendants contend that Winforge failed to mitigate its damages.  (Defs. Brief., pp. 34-35). Defendants failed to plead the failure to mitigate damages as an affirmative defense.  (Defs.' Answer, Affirmative Defenses and Counterclaim, D.E. 29, pp. 5-6).  Accordingly, Defendants are precluded from raising the defense.  *Monahan v. Obici Medical Management Services, Inc.*, 628 S.E.2d 330, 336 (Va., 2006) (noting the "requirement that affirmative defenses must be pled in order to be relied upon at trial.").  If Defendants had pled the affirmative defense, Defendants bore the burden of proof. (*Id.*).  Defendants failed to meet their burden.  Their brief is nothing more than sheer speculation.

### IX.    Conclusion.

In his opening statement, Defendants' counsel stated "[s]o on that part, Judge, the parties agree.  It is a long time from April of 2004 to August of 2005 to get the plans approved.  And were it the responsibility or fault of my clients, my clients should be found to have been in breach of contract."  (Tr. 26).  There was only one party - - MUK - - obligated to get the plans approved.  The evidence clearly established that MUK never received all of the approvals, much less in a timely

fashion.  MUK breached the Development Agreement.  As a result, Winforge sustained damages. While Winforge lost hundreds of thousands of dollars, it seeks only to be made whole.  Winforge respectfully requests the Court to extinguish the judgment previously entered in favor of Coachmen and against Winforge and McMahon.  Winforge also requests judgment in its favor and against Defendants in the amount of $1,215,152.15, plus pre-judgment interest from December 31, 2004 to the present.

Respectfully submitted.
SOPKO, NUSSBAUM, INABNIT & KACZMAREK

By: s/ Kevin E. Warren
Brent E. Inabnit #17383-71
Kevin E. Warren #26638-64
Post Office Box 300
South Bend, Indiana 46624
Telephone: (574) 234-3000
Attorneys for Plaintiffs

### CERTIFICATE OF SERVICE

Notice is hereby given of electronic filing of the foregoing on this 12th day of May, 2010, via the Court's website and electronic filing system. Contemporaneously with the filing of this Proof of Service, a copy has been served via the Court's electronic filing system to counsel of record as follows:

| Georgianne Marie Walker | W. Todd Woelfer |
| gwalker@maylorber.com | wwoelfer@maylorber.com |

s/ Kevin E. Warren

P:\WP51\DOC\ATT\KEW\Winforge\Final Reply Brief\PostTrialReply.wpd