UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WINFORGE, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | 1:06-cv-619-SEB-WGH |
| vs. | ) | |
| | ) | |
| COACHMEN INDUSTRIES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |
| | ) | |
| COACHMEN INDUSTRIES, et al., | ) | |
| | ) | |
| Counterclaimant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| WINFORGE, INC., et al., | ) | |
| | ) | |
| Counter-Defendants. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter is before the Court for decision following a trial on the remaining

dispute in this matter, which regards an alleged breach of contract. Plaintiffs Winforge,

Inc. and Byron McMahon seek a judgment entitling them to damages for Defendants'

alleged breach of a construction development agreement between the parties, claiming

that Defendants breached their contractual duties in furtherance of the construction

of a large hotel, thus creating delay and cost overruns which in turn caused Plaintiffs

ultimately to default on the corollary construction loan agreement between the parties.

Defendants Coachmen Industries, Inc., Mod-U-Kraf, LLC, and All American Homes, LLC request, by contrast, that the Court rule that no such breach occurred and that judgment be entered entitling them to the remainder of the funds due and owing under that associated loan agreement.

On the final day of trial, a post-trial briefing schedule was set for submission of the parties' proposed findings of fact and conclusions of law, post-trial briefs, and responses. These submissions were due on or before May 12, 2010.  Having now considered the evidence adduced at trial as well as the parties' post-trial submissions, we hold, as detailed below, that: (1) no final contract was ever, in fact, entered into between the parties; and (2) Defendants did not breach any of their contractual duties.  Accordingly, final judgment shall be entered in favor of Defendants, entitling them to the funds still due and owing on the construction loan as well as any and all associated costs and fees.


### *Findings of Fact*

**The Parties**

Plaintiff Winforge, Inc. ("Winforge"), a corporation organized under the laws of North Carolina, has two shareholders, Plaintiff Byron McMahon, who holds an 80 percent share of the company, and Donny Thomas, who holds a 20 percent share and is not a party to the present litigation.  (Tr. 321-322.)  These shareholders formed Winforge to develop a hotel project in Pigeon Forge, Tennessee.

McMahon is a resident of Athens, Greece.  (Tr. 314.)  He has worked most of his

2

life in the hotel industry, including among other projects developing a 347-room hotel in London, England and developing, as President of Southeast Hotel Management, three large hotels in the southeast United States.  (Tr. 317, 319-20.)

Defendant Coachmen Industries, Inc. ("Coachmen") is an Indiana corporation and is the parent of Coachmen Operations, Inc., which is the parent of Defendant Mod-U-Kraf, LLC ("Mod-U-Kraf"), a Virginia company, as well as Defendant All American Homes, LLC ("All-American").  (Tr. 434.)  Mod-U-Kraf and All-American build and deliver modular sections for use as building components in construction at sites for project developers such as Winforge.  (Tr. 438.)

***Pre-Agreement Developments***

In 2002, Michael Lee, an experienced developer of hotel projects, (Tr. 41-42, 48, 53), began investigating the potential for building a hotel using modular units based on promised cost and time efficiencies for such a mode of construction.  (Tr. 60.)  In the course of this effort, Lee spoke with Dan Brown, a representative of Mod-U-Kraf, which had previous successful experience in modular construction in large projects similar to the one contemplated by Lee.  (Tr. 435-437.)

In Fall 2002, Lee, Brown, and Jeff Powell met at Mod-U-Kraf's Virginia facility, where Lee learned about Mod-U-Kraf's previous projects and experience, and where the three discussed the potential for an as yet undefined future hotel project.  (Tr. 58, 59.)  A second meeting was later held at the Virginia facility, at which Steve Kerr, Executive

3

Vice President of All American, and Joseph Tomczak, Coachmen's Chief Financial Officer, were present. At this second meeting, Brown made a presentation detailing the possible efficiencies of modular construction for a large hotel project. (Tr. 61, 71-72; Pl. Ex. B.)[1]

In November 2002, Lee sent a letter to John Trant, a Coachmen representative, outlining the broad parameters of a potential business relationship, and, although no agreement was made at that time, Coachmen expressed interest in entering into such an agreement. (Tr. 60, 66-67.) Lee next contacted Cendant, now known as Wyndham Hotel Group, a worldwide industry leader in hotel franchising, to explain what he had learned about the benefits of modular hotel construction with a company such as Mod-U-Kraf. (Tr. 67.) An April 2003 letter from Lee to Kerr, Tomczak, and Powell indicated that Cendant had highly recommended using Matrix Hospitality, a company owned by McMahon, to develop the project. (Tr. 67-69.)[2]

Later that spring, McMahon and Donny Thomas took a tour of the Mod-U-Kraf factory, which convinced McMahon of the efficiency benefits of modular construction. (Tr. 324-328.) Accordingly, on June 24, 2003, Powell and McMahon signed a letter of intent outlining a preliminary understanding between Mod-U-Kraf, Matrix Hospitality,

---

[1] The presentation included the following timelines: "Plan Approval: 4 weeks; Off-Site Construction 5 Weeks; Delivery 1 week; Product Set 1 week," and "80% complete Hampton Inn 11 weeks." (Pl. Ex. 5B.)

[2] McMahon is a "preferred client" of Cendant, the franchisor of Wingate Hotels, which franchise was to be utilized for the hotel in Pigeon Forge. (Tr. 322.)

and Coachmen with regard to the construction of a modular hotel in Pigeon Forge,

Tennessee.  (Tr. 335.)


***The Agreement***

Mod-U-Kraf and Winforge executed the Development Agreement ("Agreement")

at issue here on April 3, 2004, (Ex. 29), the scope of which related to the development of

a Wingate Inn Hotel located in Pigeon Forge, Tennessee (the "Project").  (Id.)  According

to the Agreement, Winforge sought to "utilize modular construction for the buildings

which will comprise a portion of the Project," and for that purpose "Winforge [sought] to

purchase from [Mod-U-Kraf] the modular sections for the buildings to be incorporated

into the Project and also to engage Mod-U-Kraf to provide the setting of the modular

buildings."  (Id.)  The Agreement also provided that Flagship Development, LLC[3] would

participate as "Project Manager" and that Winforge and the Project Manager would bear

the responsibility of choosing the General Contractor for the Project.  (Id.)

The Agreement detailed the parties' responsibilities in various particulars, but the

most significant portion of the contract, and the primary subject of the parties' dispute in

this litigation, was the "Scope of Work" provision.  Throughout 2003 and early 2004, the

parties pre-agreement negotiations focused largely on this section of the contract.  (Tr.

155.)  Attached to the April 13, 2004 Agreement was a "Preliminary Scope of Work,"

which provided, in pertinent part:

─────────────

[3] Flagship Development, L.L.C. is a company owned by Lee.

1.0 General

1.1 The following document shall set out the specifications, scope of work, drawings, and pricing as prepared by Mod-U-Kraf Homes L.L.C.   The document further serves to set out the responsibilities of each of the following parties: Coachmen Industries, Inc. (COA), Lender; Winforge, inc., Owner/Buyer (Winforge), Mod-U-Kraf Homes, LLC (MUK), Modular manufacturer.

1.2 Mod-U-Kraf shall manufacture modular units at the Mod-U-Kraf manufacturing facilities in accordance with the approved Specifications and Drawings. Drawings to meet local, state, 3rd party and franshiser requirements. To include only materials and on-site services specified as supplied by MUK.

1.3 MUK shall provide modular units and material noted on plans for installation and completion of a Wingate Inn.   This will include all architectural drawings, structural calculations for modular unit construction, mechanical, electrical systems for modulars, and sprinkler system.

1.4 WINFORGE will be responsible for overseeing the completion of the modular units tie-in and components such as the following to complete the Wingate Inn on-site:

- Plumbing connections between levels
- Electrical connections and equipment as noted on plans
- Elevator
- Roof Facade (Completion of Parapet Wall)
- Finish Decor at all common areas, drop ceiling, HVAC System, Lights, Finish Floor, Drywall & Finish as shown, Entry Doors, FF&E materials, etc.
- For additional material and task, reference to plans

(Ex. 29.)

Furthermore, pursuant to this provision, Mod-U-Kraf was responsible for

"providing architectural drawings and foundation footprint . . . and receiv[ing] all state,

local and county approvals" for its contributions to the Project.   "The General Contractor

[was] responsible for the engineering of the foundation," and Winforge was required to

6

obtain the building permit from Pigeon Forge.  (<u>Id.</u>)  The Preliminary Scope of Work also enumerated other responsibilities relating to the transport of Mod-U-Kraf's modular units, the positioning and securing of those units on the Project site, and personnel and labor issues.  (<u>Id.</u>)

The Scope of Work attachment was revised no fewer than ten times before being included in this "Preliminary" form as a part of the Agreement.  (Tr. 511-514.)  Indeed, even after this version was attached to the Development Agreement, the parties continued to negotiate these terms.  In July 2004, Mod-U-Kraf sent a proposal for a final draft of the Scope of Work to Lee.  (Tr. 145.)  Lee responded that he could not review this document without an indication of changes in pricing or a "red-lined" version of the Preliminary Scope of Work, showing the proposed changes in detail.  (Tr. 145-46.)  Lacking these, he never reviewed the Scope of Work.  Powell sent another version in September 2004, but Lee also did not review it.  (Tr. 153.)   The parties dispute the finality of this version of the Preliminary Scope of Work: Plaintiffs contend that this constituted the operative language controlling the parties' responsibilities, while Defendants contend that either a subsequent version of the Scope of Work controlled or that no final agreement as to the Scope of Work was ever, in fact, reached.

The Development Agreement between Mod-U-Kraf and Winforge was not the only important contract entered into in preparation for the development of the Project.  In addition, Winforge and Coachmen entered into a separate agreement on April 14, 2004,

whereby Coachmen would provide financing for the Project ("the Loan Agreement").

(Pl. Ex. 30.)  The term of the Loan Agreement extended for a period of 150 days.  (Id.)

### *Mod-U-Kraf's Involvement in the Project*

From April 13, 2004 to June 23, 2004, Mod-U-Kraf acted as the modular manufacturer

under the Agreement.  On June 23, 2004, the responsibility for performance of the

contract passed, by virtue of a modification agreement between the parties, from Mod-U-

Kraf to All American (specifically to All American Homes of Tennessee, LLC, a

subsidiary of All American).  Prior to this shift in responsibility, Mod-U-Kraf had

undertaken in concerted fashion its obligations to perform its part of the contract.

On April 22, 2004, the franchisor, Cendant, acknowledged that Mod-U-Kraf's

architectural plans for the modular units were "100% complete," a fact which they

relayed to Winforge.  (Ex. 36.)  However, other aspects of the planning for the Project as

a whole remained incomplete, including obligations of Mod-U-Kraf, such as "PTAC" (air

conditioning) system and sprinkler system designs, as well as obligations of Winforge,

such as plumbing, elevator, electrical, and mechanical system designs.  Designs of all of

these components, which were separate from the modular designs themselves, were

required for final Project approval.

Upon learning that the modular plans were 100% complete, Winforge began the

on-site work in Pigeon Forge, which included hiring Barry Olpp as site supervisor, as

well as entering into agreements with a site engineering firm and a foundation

engineering firm.  (Tr. 130-132.)  For much of the time before Mod-U-Kraf transferred its

contractual responsibilities to All American, however, the Project proceeded in fits and

starts.  Operating with the understanding that Winforge was required to produce design

information for various aspects of the Project, including mechanical, electrical, and

plumbing design and engineering, Mod-U-Kraf did not prepare an entire finished plan

for submission to the State of Tennessee for approval.  (Tr. 194, 218, 220, 443, 495-96,

554, 558; Exs. 36, 64.)

Furthermore, Winforge specifically instructed Mod-U-Kraf not to complete

numerous tasks that had originally been denoted as the responsibility of Mod-U-Kraf

under the Preliminary Scope of Work.  For example, Winforge instructed Mod-U-Kraf

not to proceed with the development and design of certain elements of the Project, such as

the sprinkler system, despite the fact that Mod-U-Kraf had already obtained price quotes

for the design and engineering of those portions of the Project.  (Tr. 90, 95, 216, 274,

374-75, 447-450, 471-73; Ex. 43.)  Indeed, believing that it was not to proceed on such

matters without Winforge's approval, Mod-U-Kraf never developed these designs nor

entered into sub-contracts for these portions of the Project during the entire period of its

performance under the Agreement.  These alterations and disruptions contributed to

ongoing delays in the development of the Project.

On June 22, 2004, just prior to its removal from the Project, Mod-U-Kraf

submitted its then current version of plans for approval to the State of Tennessee's third

party administrator, T.R. Arnold and Associates ("T.R. Arnold").  T.R. Arnold is a review

agency approved by the State of Tennessee to conduct design review on behalf of the State. (Pl. Ex. 228.) Mod-U-Kraf submitted these plans knowing that the Project was still a work in progress, and therefore it intended the submission to be "preliminary," intending to generate a "deviation report" so that Mod-U-Kraf could refine the submission while it awaited designs from Winforge. (Tr. 562, 568, 740, 750.)

Deviation reports are commonly issued in response to plan designs, and Mod-U-Kraf hoped that knowing sooner rather than later what issues needed to be addressed would expedite the construction process. (Tr. 568, 740, 750.) The report issued to Mod-U-Kraf by T.R. Arnold listed twenty-three deviations, that is, failures to comply with the Tennessee State Code. (Pl. Ex. 65A.) The deviations noted related to sprinkler design, elevator design, mechanical and electrical plan design, fire alarm design, and insulation. (Id.) T.R. Arnold representative Ray Helmer testified that such reports are to be expected for modular designs. (Tr. 740.) The generation of this deviation report was among the final efforts undertaken by Mod-U-Kraf before it transferred its responsibilities to All American.

### All American Assumes Responsibility for Modular Construction

In June 2004, Mod-U-Kraf announced to Winforge that it had become necessary, as a result of delays in the design process, to substitute All American for Mod-U-Kraf, and for All American to assume all of Mod-U-Kraf's rights and obligations under the Agreement. (Tr. 474-475.) Winforge agreed to this transfer of responsibility. All

10

American began its performance under the contract by addressing the deviation report issued by T.R. Arnold.  (Tr. 740.)  Between June and October 2004, Winforge obtained designs of the sprinkler system and elevator, the need for which had also been included in the deviation report.

In September 2004, after incorporating the newly acquired designs, All American resubmitted the Project plans to T.R. Arnold, which generated a deviation report consisting of only two items, one of which was a minor issue that All American was able to correct quickly.  The other, much more substantial deviation called for a completed design of a mechanical and electrical plan for the Project, which required the assistance of professionals yet to be hired by Winforge.  (Tr. 569, 570.)[4]  Although overall plan approval was still dependent upon the development of those plans, on October 2004, T.R. Arnold specifically approved the modular section portion of the plans, certifying them as fully compliant with the Tennessee State Code.  (Tr. 748, 752-53.)

While T.R. Arnold was authorized by the State to approve or deny the submitted plans, the process of securing state approval included the additional step of submitting the plans to the State itself, which receives approved plans and, in some instances, seeks further information before issuing a final Letter of Filing.  (Tr. 759, Ex. R-14.)  Mike Bartlett, a Facilities Construction Specialist with the State of Tennessee's Code Enforcement Division, received the plans from T.R. Arnold and reviewed them together with his supervisor Fred Garbler.  (Pl. Ex. 227.)

---

[4] Lee ultimately hired these professionals in November 2004.

On October 19, 2004, following their review, Bartlett indicated that T.R. Arnold had performed a substandard review of the plans, (Pl. Ex. 228), and, on October 21, 2004, Bartlett sent a letter to Helmer setting forth a list of specific areas in which the plans failed to comply with the Tennessee Code, including: (1) failure to identify clearly whether All American or Mod-U-Kraf was responsible for the modular construction; (2) failure to affix certain engineering seals; and (3) failure to complete HVAC, plumbing, and mechanical designs. (Tr. 770-71.) None of the deviations listed by the State related to the design of the modular units themselves, but rather only to other aspects of the Project.

In December 2004, Helmer issued another deviation report to All American, reiterating the issues that the State had communicated to him. (Tr. 755-56.) Helmer indicated to All American that he believed the State's decision to reject the plans in their entirety based on issues relating to site work, rather than to issue a Letter of Filing for the modular units in conjunction with a deviation report for separate issues, was "very unusual." (Tr. 762.) His opinion was based on his understanding that the State's Letter of Filing approval related only to the modular portion of a Project, and the modular unit designs had been deemed fully compliant and complete. (Id.) Because no Letter of Filing had been issued, All American was unable to begin construction of the modular units at its Tennessee facility. Accordingly, the Project remained on hold awaiting a resolution of these long-delayed design issues.

***Coachmen Freezes Funds From the Loan and Site Designs Progress***

In January 2005, Winforge requested a further draw on the construction loan under the Loan Agreement with Coachmen.  (Tr. 166-67.)[5]  On February 18, 2005, Coachmen denied this draw request, informing Lee that money would be withheld until Winforge proceeded with its obligations to develop the Project.  (Id.; Ex. 107.)

Up to this point, Coachmen had provided Winforge with significant funding from the construction loan.  (Tr. 201.)  Despite these funds, Winforge had yet to hire a General Contractor, as it was required to do under the Agreement, choosing instead to assign Lee and McMahon to the role at various points, neither of whom Defendants believed was qualified to perform those duties.  (Tr. 624.)  Coachmen made clear in its January 2005 communication that Winforge would not be entitled to further funds until it had completed various tasks assigned to it in the Agreement, including mechanical and electrical designs and insulation selection, which were deemed critical to receiving State approval of the plans for the Project as a whole.

***Final State Approval***

Winforge completed the design of the mechanical and electrical plans on March 3, 2005, spurring the parties to begin working together once again to resubmit the Project plans to T.R. Arnold. All American submitted revised plans to T.R. Arnold, which

---

[5] Also in January 2005, Carel Whiteside, who had been charged with the responsibility of managing Defendants' obligations under the Agreement, retired and ceased his involvement in the Project.  (Tr. 646.)  At that time, Dave Kurth replaced Whiteside as the manager of All American's Tennessee facility.  (Tr. 647.)

Helmer reviewed and responded to once again by way of a deviation list.  (Tr. 756-757.)

Incorporating the necessary changes indicated by T.R. Arnold, All American submitted a

revision to this set of plans in May 2005, which Helmer approved and forwarded to the

State of Tennessee.  (Tr. 758.)  On May 13, 2005, the State responded with a detailed list

of forty-eight deviations relating to three key substantive design issues: a faulty sprinkler

design, an inadequate fire alarm design, and a faulty smoke egress design for the lobby

area.  (See Tr. 762.)  As with the prior deviation lists, none of these insufficiencies related

to the modular plans themselves.

During the summer of 2005, the plans finally began to move towards a more

complete and acceptable form.  Winforge had previously instructed Mod-U-Kraf not to

contract for the sprinkler design, and, in June 2004, Winforge assumed the sole

responsibility for obtaining the sprinkler contract through a contract modification agreed

to by both parties.  (Tr. 374-75.)  Winforge was working to complete an acceptable design

of the sprinkler system at this time, since the original design had been rejected in the

State's May 2005 deviation list; Winforge successfully produced a code-compliant design

in August 2005.  (Id.)  The lobby egress issue, of which the parties were not aware prior

to the May 2005 deviation list from the State, was also resolved in August 2005.[6]

After incorporating these changes, All American resubmitted the plans to T.R.

Arnold, which approved and forwarded them once again to the State.  (Ex. 228.)  On

_____

[6] A further problem experienced by the parties in the Summer of 2005 involved an investigation into the licensing of an architect and engineer hired by All American, which Plaintiffs contend also contributed to the delays in Project approvals.  (Tr. 648; Pl. Ex. 137B.)

August 30, 2005, the State of Tennessee issued a Letter of Filing for the Project,

authorizing All American to begin construction of the modular units for the project.  (Ex.

227; Tr. 632.)[7]

      Prior to commencing construction, one additional approval was required, that was, a

building permit from Pigeon Forge, which Winforge was to obtain.[8]  Although Winforge

produced a "Building Permit Application," they apparently never completed or submitted this

document, leaving certain items on the form blank or marked "TBD."  (Ex. 181a.)

Because no building permit was secured, and because Winforge had still not hired a

General Contractor, Dave Kurth at All American hired a General Contractor, D.F. Chase,

to seek this permit.  D.F. Chase filed a building permit application with the City of Pigeon

Forge, which reviewed the application and rejected it on February 13, 2006, on the

ground that the city's sewer system was inadequately prepared for the Project.  (Ex. 207.)[9]

This rejection letter clearly indicated that an earlier application–in other words, a timely

application submitted by Winforge–would have likely met with approval because the

---

      [7] After the State of Tennessee issued the Letter of Filing for the Project, Defendants
notified Lee that manufacture of the modular units would be transferred from All American's
Tennessee facility to its North Carolina facility because of an insufficient employment base at
the Tennessee facility.  (Tr. 177-78, 654.)

      [8] On November 18, 2005, McMahon contacted Coachmen CEO Claire Skinner to
schedule a meeting to resolve ongoing issues, with a hope of shepherding the Project toward
completion.  (Tr. 346.)  Thereafter, on November 21, 2005, a meeting was held at Coachmen
headquarters, at which McMahon urged All American to provide a date on which factory
construction would begin.  (Tr. 353-54.)  Apparently, no such date was set at the meeting.

      [9] According to Defendants, shortly after August 30, 2005, Pigeon Forge approved the
modular portion of the Project, though it did not approve of the Project as a whole.  (Tr. 635,
660, 765; Ex. 228.)

sewer issue did not arise until slightly before D.F. Chase had applied for the permit. No future attempts were made by anyone to obtain this permit. Without such approval, the Project was at a permanent standstill, and All American therefore never began manufacturing the modular units, reasonably concluding that to do so would be futile, since the units would never be incorporated into the Project.

Acknowledging that the purpose of the Development Agreement had been unalterably stymied, on February 23, 2006, Coachmen notified Winforge that Winforge was in default of the Loan Agreement. (Ex. 208.) One month later, March 24, 2006, Coachmen notified Winforge that Coachmen intended to institute foreclosure proceedings and attached a Note of Foreclosure stating that the property was to be sold on April 21, 2006. (Ex. 210.) On November 15, 2006, the real estate was sold; Coachmen held the highest bid and purchased the property for $1.8 million. On January 30, 2007, Coachmen auctioned the personal property that it held as collateral pursuant to the Security Agreement; the net proceeds of $283,142.79 were paid to Coachmen and applied against the loan deficit.

During the course of the development of the Project, Lee and McMahon obtained draws on the loan amounting to more than forty percent of the total projected cost of the project, paying themselves and the entities they had engaged in relation to the Project in excess of $1.2 million. Believing that the losses incurred were the fault of All American, Mod-U-Kraf, and Coachmen, and thus that the loan default was caused by Defendants'

conduct, Plaintiffs brought this cause of action, seeking to defeat the foreclosure,[10] and

seeking to hold Defendants responsible for the alleged breach of contract.  Defendants

responded by filing a counterclaim against Plaintiffs for breach of contract.

### *Conclusions of Law*

**I.**      ***Validity of the Agreement***

Pursuant to the Development Agreement at issue in this matter, Virginia law

applies to the resolution of all contractual disputes between the parties.  (Ex. 29.)  Under

Virginia law, contract interpretation is a question of law, <u>PMA Capital Ins. Co. v. U.S.</u>

<u>Airways, Inc.</u>, 626 S.E.2d 369, 372 (Va. 2006), and Plaintiffs bear the burden of proving

the existence of a contract, and of proving a breach by Defendants.  <u>See</u> <u>Sunrise</u>

<u>Continuing Care, LLC v. Wright</u>, 671 S.E.2d, 135 (Va. 2009).   "The primary goal in the

construction of written contracts is to determine the intent of the contracting parties, and

intent is to be determined from the language employed, surrounding circumstances, the

occasion, and apparent object of the parties."  <u>Flippo v. CSC Assocs. III, L.L.C.</u>, 547

S.E.2d 216, 226 (Va. 2001).

In the absence of any ambiguity in the contract, a court interprets the agreement

between the parties by examining solely the language contained therein.  <u>School Bd. of</u>

<u>City of Newport News v. Commonwealth of Virginia</u>, 689 S.E.2d 731, 735 (Va. 2010).

---

[10] Plaintiffs contacted Coachmen and requested a postponement of the foreclosure sale pending court direction, which (Plaintiffs assert) Coachmen refused. Although Plaintiffs filed this lawsuit and sought to enjoin the foreclosure sale, their request in that regard was denied by the Court at summary judgment.

However, latent ambiguities may be clarified by parol evidence. <u>Galloway Corp. v. S.B.</u>
<u>Ballard Constr. Co.</u>, 464 S.E.2d 349, 355 (Va. 1995). "An ambiguity exists when
language is of doubtful import, admits of being understood in more than one way, admits
two or more meanings, or refers to two or more things at the same time." <u>Id.</u>

The first issue before the Court regards whether the Development Agreement was
valid and enforceable.[11]  Defendants contend that provisions in the Preliminary Scope of Work
were not definite and were never agreed to in a precise and definite form by the parties.
"[M]utuality of assent–the meeting of the minds of the parties–is an essential element of
all contracts.  Until the parties have a distinct intention common to both . . . there is a lack
of mutual assent and, therefore, no contract." <u>Moorman v. Blackstock, Inc.</u>, 661 S.E.2d
404, 409 (Va. 2008) (internal citations omitted).

Plaintiffs contend that the "Preliminary" heading accompanying the Scope of
Work attached to the Development Agreement was a "meaningless" designation. The
record makes clear, however, that, even after entering into the Development Agreement,
the parties continued to negotiate over the final terms. Although the parties signed
the Development Agreement, with the accompanying Preliminary Scope of Work, in
April 2004, the precise terms remained in flux due to their negotiations for a period of time
far beyond that date.

---

[11] Plaintiffs contend that this issue was resolved previously in the Court's Order on
Summary Judgment, in which the Court found, generally, that the parties had entered into a
Development Agreement.  This finding was not based on any specific factual or legal findings as
to validity or enforceability, which issues manifested fully at trial.  Thus, Defendants are not, as
Plaintiffs urge, precluded from raising this defense to formation. <u>E.g.</u>, <u>Occidental Fire &</u>
<u>Casualty Co. v. Continental bank N.A.</u>, 918 F.2d 1312, 1230 (7th Cir. 1990).

In July 2004, Mod-U-Kraf transmitted a proposal for a final draft of the Scope of Work to Lee. (Tr. 145.) Lee's response did not claim that a final version existed or had previously been created, nor did he indicate in any other way that he viewed Defendants' continuing efforts to negotiate these terms odd or inappropriate. Instead, Lee requested a description of the way the newly proposed terms would affect the pricing of the Project, and by requesting a "red-lined" Scope of Work, so that he could visualize the differences between the previous version (the one attached to the Development Agreement) and the July revisions. (Tr. 145-46.) The evidence establishes that, lacking these, Lee therefore never did review this finally proposed Scope of Work, much less approve it.

Powell on behalf of Mod-U-Kraft sent Lee yet another version of the Scope of Work in September 2004, but Lee did not review that version either for the same reasons, namely, that pricing changes were not clearly enumerated to his satisfaction and the new version was not drafted to track with the original document. (Tr. 153.) Nothing in the record indicates that Lee declined to review these proposed revisions because he believed the negotiations were already complete. Indeed, a conference call on January 25, 2005, revealed that Lee and McMahon, both of whom were working on behalf of Winforge, had differing opinions as to the Preliminary Scope of Work. Lee asserted that he believed the document had been modified or was open to modification, whereas McMahon expressed his belief and hope that the parties would continue to honor the "Preliminary" attachment as binding.

Given these clear indications by the parties that the Scope of Work accompanying the Development Agreement was "Preliminary," as well as significant evidence that the parties continued to negotiate the Scope of Work well after the date they signed the Development Agreement and that no final version of the Scope of Work was ever agreed upon, it is obvious that the parties' initial "preliminary" agreement as to these key performance terms was not, in fact, final.  Thus, because the essence of the parties' dispute in this litigation regards different interpretations and understandings of the terms contained in that Preliminary Scope of Work, the parties never achieved a "distinct intention common to both" as to central aspects of the contract.  Moorman, 661 S.E.2d at 409. Accordingly, the contract between the parties lacked mutuality of assent as to essential terms;  indeed, no contract ever, in fact, existed.  Id.  For this reason, Plaintiffs' claims of breach cannot succeed, and Defendants are entitled to a final judgment on this issue.

## II.      *Whether Mod-U-Kraf or All American Breached the Agreement*

Assuming *arguendo* that a contract was, in fact, formed based on the agreement between the parties embodied in the language contained in the Development Agreement and in the Preliminary Scope of Work, the central remaining dispute relates to who, if anyone, breached the contract.  The parties' differing views on that matter stem from their respective interpretations of the obligations assigned to each party under the contract provisions.  Plaintiffs contend that, pursuant to the terms laid out in the contract, Mod-U-Kraf (and later All American) was obligated to prepare all plans necessary to complete

the hotel building; obtain the necessary franchiser, third-party, state, and local approvals

for all plans; and to manufacture and deliver modular units to Winforge in Tennessee.

Furthermore, all of this was to be completed by December 31, 2004.  According to

Plaintiffs, because Defendants received approval from the State of Tennessee in August

2005, six months late, and because Defendants failed to complete the construction of any

modular units, Defendants are accused of having breached the Development Agreement.


    A.    *Failure to Obtain Plan Approvals*

    The obligations of the parties are governed by the unambiguous terms of the

contract and are determined from the "language employed, surrounding circumstances,

the occasion, and apparent object of the parties."  Flippo, 547 S.E.2d at 26 (quoting

Christian v. Bullock, 205 S.E.2d 635, 638 (Va. 1974).  According to the Agreement,

Mod-U-Kraf's "modular construction" was to "comprise a portion of the Project."

"Winforge [sought] to purchase" those "modular sections for the buildings to be

incorporated into the Project and also to engage Mod-U-Kraf to provide the setting of the

modular buildings."  (Ex. 29.)  This part of the Agreement also provided that Winforge

and the Project Manager would bear the responsibility of choosing the General Contractor

for the Project.  (Id.)  Although this section of the Development Agreement did not provide

a detailed and complete description of the parties' responsibilities, it framed their understanding

of the contractual relationship between them in general and as a whole.

The language contained in the Preliminary Scope of Work, which detailed the parties' performance obligations, reinforced the above-quoted language. Specifically, Section 1.2 stated, in pertinent part, "Mod-U-Kraf shall manufacture modular units . . . . Drawings to meet local, state, third-party and franchiser requirements. To include only materials and on-site services specified as supplied by MUK." (Id.) Further, Section 1.3 of the Scope of Work provided: "MUK shall provide modular units and material noted on plans for installation and completion of a Wingate Inn. This will include all architectural drawings, structural calculations for modular unit construction, mechanical, electrical systems for modulars, and sprinkler system." (Id.)

The contract clearly did, as Plaintiffs contend and as Defendants concede, require Mod-U-Kraf (and All American) to complete construction of the modular units. This could not, however, be accomplished, nor even begun, until all necessary plans were produced and approved. Thus, the crux of the parties' dispute centers on who was ultimately responsible for the failure of the Project to receive timely approvals at all levels. Plaintiffs urge the Court to interpret the above language as assigning to Mod-U-Kraf the responsibility to prepare all architectural drawings needed in order to obtain all necessary approvals for the Project. The language of the contract does not, however, support such an interpretation.

Plaintiffs' emphasis on phrases such as "all architectural drawings" is far too narrow a reading of the terms of the Agreement. Courts in Virginia and elsewhere apply the rule of interpretation referred to as *ejusdem generis* in interpreting such language.

22

Under this rule of construction, "when general and specific words are grouped, the general words are limited by the specific and will be construed to embrace only objects similar in nature to those things identified by the specific words." Wood by & Through Wood v. Henry County Pub. Schs., 495 S.E.2d 255, 260-61 (Va. 1998); see also Caldwell v. Transportation Ins. Co., 364 S.E.2d 1 (Va. 1988) (recognizing the application of the rule in contract interpretation as well as statutory construction).

Both Sections 1.2 and 1.3 of the Scope of Work make clear that they refer specifically to Mod-U-Kraf's duty to manufacture and provide modular units. Accordingly, the obligation specifically assigned to Mod-U-Kraf to prepare "drawings" and to obtain approval for those drawings and associated plans was clearly limited to its responsibility for providing modular units, not to the building project as a whole.  In fact, in other sections of the Preliminary Scope of Work, Winforge explicitly agreed to provide designs for other components of the building.  (Ex. 29 Sections 1.4, 4.1, 5, 6, 7, 8, 9, 10.)

For obvious reasons, Plaintiffs do not rely heavily on the contract language itself. Rather, they advance the following distinction between the obligations of Mod-U-Kraf and those of Winforge: that "the building itself from the ground up" was Mod-U-Kraf's responsibility, whereas "the area outside of the building" was Winforge's charge.  (Tr. 93, 125-27.)  This language is not set out expressly in the contract between the parties, and it can not be inferred from any the circumstances surrounding the agreement.  Therefore, it is no reliable basis for reaching that understanding of the contract. Flippo, 547 S.E.2d at 226 (quoting Ames v. American Nat'l Bank, 176 S.E.2d 204 (Va. 1934) ("The polestar

23

for the construction of a contract is the intention of the contracting parties *as expressed by them in the words they have used*.").  Mod-U-Kraf's responsibility for plan designs, as stated clearly in the agreement, was limited to those designs relating to modular units and other specifically stated components.

Mod-U-Kraf, and later All American, also agreed to obtain licenses, permits, and approvals for the modular units they were to supply for the Project.  Winforge accepted responsibility for all other licenses and approvals:

> Except for those licenses, permits and fees related to the Work which are the responsibility of [Mod-U-Kraf] pursuant to this Agreement, Winforge and the General Contractor or the Project Manager shall secure and pay for all other licenses, permits, approvals, . . . required for the development, construction, use or occupancy of permanent structures or for permanent changes in existing facilities, including the building permits.

(Ex. 29.)  Thus, adhering to the clear language of the contract, we conclude that Mod-U-Kraf and All American's design-approval duties were limited to the modular unit design and only those other duties specifically enumerated, such as sprinkler system design.[12]

As for those specifically enumerated duties, the parties also dispute the division of responsibilities relating to the provision of plans and final construction of the sprinkler system, PTAC, and other mechanical and electrical components of the building.  The Preliminary Scope of Work attached to the Development Agreement clearly assigned these duties to Mod-U-Kraf.  (Ex. 29.)  In June of 2004, however, Winforge

---

[12] Our review of the assignment of duties contained in the contract reveals that the parties simply failed to apportion certain tasks adequately, leaving gaps that ultimately doomed the project. At best, the agreement reads more like a contract for the supply of modular units than for the construction of an entire hotel.

24

communicated verbally to Mod-U-Kraf that it would take over these responsibilities, and

Mod-U-Kraf agreed to this modification.  (Tr. 374.)  Moreover, prior to this point,

Winforge had instructed Mod-U-Kraf not to pursue completion of the sprinkler design.

(Tr. 471-73.)

     Although the parties never reduced this modification of the contract to writing, the

modification of a contract may be accomplished, and thus shown at trial, with evidence of

the parties' course of dealing.  Cardinal Development Co. v. Stanley Constr. Co., Inc.,

497 S.E.2d 847, 851 (Va. 1998).  Thus, no writing embodying the modification was

necessary, so long as the oral modification was evident from the facts adduced and the

parties' conduct in dealing with one another evinced the same.  Id.  This holds true even

though the original contract required certain changes to be made in writing.  See Reid v.

Boyle, 527 S.E.2d 137, 145 (Va. 2000).

     Here, McMahon testified that he proposed a modification to the contract, whereby

Winforge would assume the duty to provide the designs for these components, in

exchange for which Mod-U-Kraf would receive less money from Winforge.  (Tr. 374-75.)

Mod-U-Kraf agreed to this change and did not thereafter pursue designs or construction

of these components.  Indeed, consistent with this modification agreement, Winforge later

attempted to, and in some cases ultimately succeeded in, obtaining approval for the

construction of these portions of the Project.  Thus, the course of dealing of the parties

clearly demonstrates that they did, in fact, modify the Scope of Work in this manner and

that Winforge thereby accepted responsibility to perform these portions of the Project.

25

The evidentiary record developed at trial demonstrates that the design approval deficiencies and failures that delayed and ultimately doomed the Project related to the sprinkler system design (Ex. 65A, Tr. 762), elevator design (Ex. 65A), mechanical and electrical system design (Ex. 65A, Tr. 770-71), and HVAC and plumbing system design (Tr. 770-771). Under the clear language of the contract, including the parties' modification agreement, Plaintiffs bore the responsibility for the design, development, and obtainment of approval for all of these components. Plaintiffs' failure to obtain these design approvals in a timely fashion led to repeated rejections of the Project plans by the State.

Despite the delays created by Plaintiffs' delinquency, All American was able to produce a final version of the Project plans which earned T.R. Arnold's approval in late August 2005, and for which, on August 30, 2005, the State of Tennessee issued a Letter of Filing, authorizing All American to begin construction of the modular units for the project. Thus, it is clear that Defendants were moving forward with plan approvals as quickly as possible despite the delays to other aspects of the project caused by Plaintiffs.

Although these approvals had been obtained, the Project still could not be commenced in earnest because the final piece of the puzzle, a Pigeon Forge building permit, had not been secured. The obligation to seek and obtain that building permit unequivocally belonged to Winforge. (Ex. 29, Sec. 9.) Winforge prepared a document called the "Building Permit Application," but it was clearly incomplete, as many items were left blank or marked "TBD." Because Plaintiffs failed to obtain this approval, Defendants,

going above and beyond their contractual obligations, attempted to obtain it. Their attempt ultimately failed, but Plaintiffs cannot treat Defendants' failure as a breach of the contract, given that their own breach precipitated Defendants' failure to obtain this approval.[13]

Accordingly, the record at trial establishes that Defendants produced all of the designs and obtained all of the approvals that they were required to produce and obtain. Furthermore, although the completed Project designs were not approved by the State of Tennessee within the time frame contained in the contract, the delays Defendants experienced in obtaining final approvals were the result of Plaintiffs' own dilatoriness and ineffectiveness and failures.  Therefore, we hold that Defendants did not breach the portion of the contract relating to plan design and approval and cannot be held liable on that basis.

B.   *Failure to Construct Modular Units*

In the end, all but one of the approvals for the Project were obtained.  Lacking the final building permit, Defendants made the decision not to construct any modular units,

---

[13] In an effort to divert attention from their failure to obtain a Pigeon Forge building permit, Plaintiffs also contend that Defendants breached the agreement by failing to obtain Pigeon Forge approval for the modular units.  That no such approval was given is not, however, established in the record of evidence adduced at trial.  All that is clear from the record is that Pigeon Forge never issued the final building permit to the parties to begin construction of the Project.  No evidence was adduced by either party showing whether Pigeon Forge did or did not approve the modular portions of the plan.  All that is before the Court is a he-said-she-said presentation by the parties, in which Plaintiffs contend that no approval was issued, while Defendants assert the opposite.  The burden of proof on this point, as with each disputed issue at trial, lies with Plaintiffs.  Volvo White Truck Corp. v. Vineyard, 387 S.E.2d 763, 766-67 (Va. 1990).  Where, as here, no evidence on the point of proof is submitted, the party with the burden loses.  Thus, Defendants cannot be found to have breached the contract by virtue of failing to acquire this specific approval from Pigeon Forge.

ostensibly viewing the lack of a building permit as critical to their duty and ability to perform their obligations.  Although the contract required them to construct the modular units, Defendants' failure to do so did not constitute a breach on their part because their failure cannot be attributed to any deficiency of performance by them, for two reasons: First, no modular units could be constructed and installed without proper, specific governmental authorization for their construction.  This issue became a thorn in the side of Mod-U-Kraf and All American, as T.R. Arnold and the State of Tennessee never issued any deviations associated with the modular unit designs themselves.  Indeed, both T.R. Arnold and the State deemed the modular unit designs fully compliant.  Despite this, the State chose not to approve those specific designs until the designs for the entire Project were completed.  This "very unusual" decision on the State's part, (Tr. 762), prevented Defendants from moving forward, just as it became the final obstacle to Plaintiffs' efforts.

Moreover, the State's decision not to approve those plans was entirely the result of the other deficiencies in the Project plans, which were, as discussed previously, caused by Plaintiffs' actions.  Because the record makes clear that Defendants did everything in their power to perform their contractual obligations by preparing compliant designs for the modular units, they cannot, in our view, be held responsible for the State's unusual choice to proceed in this fashion, in particular because the State's decision, as we have previously noted, was precipitated by design failures on the part of Plaintiffs.

The second reason that no modular units were produced also demonstrates that the fault for a lack of production lay with Plaintiffs, not Defendants.  Plaintiffs never

acquired, as they were required to do, a building permit from the City of Pigeon Forge. Therefore, the Project simply could not proceed, and Defendants had no reason to begin modular unit construction for an obviously stalled project.  To do so would have been a foolish waste of resources.  Indeed, producing the modular units, knowing they never could have been used in the construction of the hotel, would have been contrary to Defendants' general obligation to mitigate the damages accruing under the Agreement.

Accordingly, for these reasons, we conclude that the failure of Defendants to construct modular units was clearly not a breach of their duty since their performance was frustrated and ultimately excusable due to Plaintiffs.  Thus, we hold that Defendants are not liable for any breach of duty to construct the modular units for the Project.

### III.    *Conclusion*

For the reasons explicated above, the Court hereby rules as follows:

(1)    Defendants are not liable to Plaintiffs as a result of any breach of any provision of the Development Agreement between the parties, including the Preliminary Scope of Work.  Therefore:

(2)    Defendants are entitled to a judgment in their favor for all amounts currently due and owing by Winforge under the Promissory Note securing the Loan Agreement, including the principal sum of $2,347,587.31, plus accrued interest through June 5, 2006, totaling $292,486.15, plus additional interest accrued after June 5, 2006, plus all costs, including attorneys' fees, paid or incurred by Coachmen in connection with the enforcement of the Promissory Note and Guarantee, plus the costs of this action.

IT IS SO ORDERED.

Date:    _____08/20/2010_____

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Brent Emerson Inabnit
SOPKO NUSSBAUM INABNIT & KACZMAREK
brenti@sni-law.com

Georgianne Marie Walker
MAY OBERFELL LORBER
gwalker@maylorber.com

Kevin E. Warren
SOPKO, NUSSBAUM, INABNIT & KACZMAREK
kevinw@sni-law.com

W. Todd Woelfer
MAY OBERFELL & LORBER
wwoelfer@maylorber.com